# MARSHALL, SECRETARY OF LABOR, ET AL. *v.* BARLOW'S, INC.

No. 76–1143.   Argued January 9, 1978—Decided May 23, 1978

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, MARSHALL, and POWELL, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN and REHNQUIST, JJ., joined, *post*, p. 325. BRENNAN, J., took no part in the consideration or decision of the case.

*Solicitor General McCree* argued the cause for appellants. With him on the briefs were *Deputy Solicitor General Wallace, Stuart A. Smith,* and *Michael H. Levin.*

*John L. Runft* argued the cause for appellee. With him on the brief was *Iver J. Longeteig.**

---

**Warren Spannaus,* Attorney General of Minnesota, *Richard B. Allyn,* Solicitor General, and *Steven M. Gunn* and *Richard A. Lockridge,* Special Assistant Attorneys General, filed a brief for 11 States as *amici curiae* urging reversal, joined by the Attorneys General for their respective States as follows: *Frank J. Kelley* of Michigan, *William F. Hyland* of New Jersey, *Toney Anaya* of New Mexico, *Rufus Edmisten* of North Carolina, *Robert P. Kane* of Pennsylvania, *Daniel R. McLeod* of South Carolina, *M. Jerome Diamond* of Vermont, *Anthony F. Troy* of Virginia, and *V. Frank Mendicino* of Wyoming. Briefs of *amici curiae* urging reversal were filed by *J. Albert Woll* and *Laurence Gold* for the American Federation of Labor and Congress of Industrial Organizations; and by *Michael R. Sherwood* for the Sierra Club et al.

Briefs of *amici curiae* urging affirmance were filed by *Wayne L. Kidwell,* Attorney General of Idaho, and *Guy G. Hurlbutt,* Chief Deputy Attorney General, *Robert B. Hansen,* Attorney General of Utah, and *Michael L. Deamer,* Deputy Attorney General, for the States of Idaho and Utah; by *Allen A. Lauterbach* for the American Farm Bureau Federation; by *Robert T. Thompson, Lawrence Kraus,* and *Stanley T. Kaleczyc* for the Chamber of Commerce of the United States; by *Anthony J. Obadal, Steven R.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Section 8 (a) of the Occupational Safety and Health Act of 1970 (OSHA or Act)[1] empowers agents of the Secretary of Labor (Secretary) to search the work area of any employment facility within the Act's jurisdiction. The purpose of the search is to inspect for safety hazards and violations of OSHA regulations. No search warrant or other process is expressly required under the Act.

On the morning of September 11, 1975, an OSHA inspector entered the customer service area of Barlow's, Inc., an electrical and plumbing installation business located in Pocatello, Idaho. The president and general manager, Ferrol G. "Bill" Barlow, was on hand; and the OSHA inspector, after showing his credentials,[2] informed Mr. Barlow that he wished to con-

---

*Semler, Stephen C. Yohay, Leonard J. Theberge, Edward H. Dowd,* and *James Watt* for the Mountain States Legal Foundation; by *James D. McKevitt* for the National Federation of Independent Business; and by *Ronald A. Zumbrun, John H. Findley, Albert Ferri, Jr.,* and *W. Hugh O'Riordan* for the Pacific Legal Foundation.

Briefs of *amici curiae* were filed by *Robert E. Rader, Jr.,* for the American Conservative Union; and by *David Goldberger, Barbara O'Toole, McNeill Stokes, Ira J. Smotherman, Jr.,* and *David Rudenstine* for the Roger Baldwin Foundation, Inc., of the American Civil Liberties Union, Illinois Division.

[1] "In order to carry out the purposes of this chapter, the Secretary, upon presenting appropriate credentials to the owner, operator, or agent in charge, is authorized—

"(1) to enter without delay and at reasonable times any factory, plant, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer; and

"(2) to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and to question privately any such employer, owner, operator, agent, or employee." 84 Stat. 1598, 29 U. S. C. § 657 (a).

[2] This is required by the Act. See n. 1, *supra.*

duct a search of the working areas of the business. Mr. Barlow inquired whether any complaint had been received about his company. The inspector answered no, but that Barlow's, Inc., had simply turned up in the agency's selection process. The inspector again asked to enter the nonpublic area of the business; Mr. Barlow's response was to inquire whether the inspector had a search warrant. The inspector had none. Thereupon, Mr. Barlow refused the inspector admission to the employee area of his business. He said he was relying on his rights as guaranteed by the Fourth Amendment of the United States Constitution.

Three months later, the Secretary petitioned the United States District Court for the District of Idaho to issue an order compelling Mr. Barlow to admit the inspector.[3]  The requested order was issued on December 30, 1975, and was presented to Mr. Barlow on January 5, 1976. Mr. Barlow again refused admission, and he sought his own injunctive relief against the warrantless searches assertedly permitted by OSHA. A three-judge court was convened. On December 30, 1976, it ruled in Mr. Barlow's favor. 424 F. Supp. 437. Concluding that *Camara* v. *Municipal Court,* 387 U. S. 523, 528–529 (1967), and *See* v. *Seattle,* 387 U. S. 541, 543 (1967), controlled this case, the court held that the Fourth Amendment required a warrant for the type of search involved here [4] and that the statutory authorization for warrantless inspections was unconstitutional. An injunction against searches or inspections pursuant to § 8 (a) was entered. The Secretary appealed, challenging the judgment, and we noted probable jurisdiction. 430 U. S. 964.

---

[3] A regulation of the Secretary, 29 CFR § 1903.4 (1977), requires an inspector to seek compulsory process if an employer refuses a requested search. See *infra,* at 317, and n. 12.

[4] No *res judicata* bar arose against Mr. Barlow from the December 30, 1975, order authorizing a search, because the earlier decision reserved the constitutional issue. See 424 F. Supp. 437.

## I

The Secretary urges that warrantless inspections to enforce OSHA are reasonable within the meaning of the Fourth Amendment. Among other things, he relies on § 8 (a) of the Act, 29 U. S. C. § 657 (a), which authorizes inspection of business premises without a warrant and which the Secretary urges represents a congressional construction of the Fourth Amendment that the courts should not reject. Regrettably, we are unable to agree.

The Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes. To hold otherwise would belie the origin of that Amendment, and the American colonial experience. An important forerunner of the first 10 Amendments to the United States Constitution, the Virginia Bill of Rights, specifically opposed "general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed." [5] The general warrant was a recurring point of contention in the Colonies immediately preceding the Revolution.[6] The particular offensiveness it engendered was acutely felt by the merchants and businessmen whose premises and products were inspected for compliance with the several parliamentary revenue measures that most irritated the colonists.[7] "[T]he Fourth Amendment's commands grew in large measure out of the colonists' experience with the writs of assistance . . . [that] granted sweeping power to customs officials and other agents of the King to search at large for smuggled goods." *United States* v. *Chadwick,* 433 U. S. 1, 7–8 (1977).

---

[5] H. Commager, Documents of American History 104 (8th ed. 1968).

[6] See, *e. g.,* Dickerson, Writs of Assistance as a Cause of the Revolution in The Era of the American Revolution 40 (R. Morris ed. 1939).

[7] The Stamp Act of 1765, the Townshend Revenue Act of 1767, and the tea tax of 1773 are notable examples. See Commager, *supra,* n. 5, at 53, 63. For commentary, see 1 S. Morison, H. Commager, & W. Leuchtenburg, The Growth of the American Republic 143, 149, 159 (1969).

See also *G. M. Leasing Corp.* v. *United States,* 429 U. S. 338, 355 (1977). Against this background, it is untenable that the ban on warrantless searches was not intended to shield places of business as well as of residence.

This Court has already held that warrantless searches are generally unreasonable, and that this rule applies to commercial premises as well as homes. In *Camara* v. *Municipal Court, supra,* at 528–529, we held:

> "[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."

On the same day, we also ruled:

> "As we explained in *Camara,* a search of private houses is presumptively unreasonable if conducted without a warrant. The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property. The businessman, too, has that right placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be made and enforced by the inspector in the field without official authority evidenced by a warrant." *See* v. *Seattle, supra,* at 543.

These same cases also held that the Fourth Amendment prohibition against unreasonable searches protects against warrantless intrusions during civil as well as criminal investigations. *Ibid.* The reason is found in the "basic purpose of this Amendment . . . [which] is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara, supra,* at 528. If the government intrudes on a person's property, the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or

regulatory standards. It therefore appears that unless some recognized exception to the warrant requirement applies, *See* v. *Seattle* would require a warrant to conduct the inspection sought in this case.

The Secretary urges that an exception from the search warrant requirement has been recognized for "pervasively regulated business[es]," *United States* v. *Biswell,* 406 U. S. 311, 316 (1972), and for "closely regulated" industries "long subject to close supervision and inspection." *Colonnade Catering Corp.* v. *United States,* 397 U. S. 72, 74, 77 (1970). These cases are indeed exceptions, but they represent responses to relatively unique circumstances. Certain industries have such a history of government oversight that no reasonable expectation of privacy, see *Katz* v. *United States,* 389 U. S. 347, 351–352 (1967), could exist for a proprietor over the stock of such an enterprise. Liquor (*Colonnade*) and firearms (*Biswell*) are industries of this type; when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation.

Industries such as these fall within the "certain carefully defined classes of cases," referenced in *Camara,* 387 U. S., at 528. The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware. "A central difference between those cases [*Colonnade* and *Biswell*] and this one is that businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, whereas the petitioner here was not engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him." *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 271 (1973).

The clear import of our cases is that the closely regulated industry of the type involved in *Colonnade* and *Biswell* is the exception. The Secretary would make it the rule. Invoking

the Walsh-Healey Act of 1936, 41 U. S. C. § 35 *et seq.*, the Secretary attempts to support a conclusion that all businesses involved in interstate commerce have long been subjected to close supervision of employee safety and health conditions. But the degree of federal involvement in employee working circumstances has never been of the order of specificity and pervasiveness that OSHA mandates. It is quite unconvincing to argue that the imposition of minimum wages and maximum hours on employers who contracted with the Government under the Walsh-Healey Act prepared the entirety of American interstate commerce for regulation of working conditions to the minutest detail. Nor can any but the most fictional sense of voluntary consent to later searches be found in the single fact that one conducts a business affecting interstate commerce; under current practice and law, few businesses can be conducted without having some effect on interstate commerce.

The Secretary also attempts to derive support for a *Colonnade-Biswell*-type exception by drawing analogies from the field of labor law. In *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793 (1945), this Court upheld the rights of employees to solicit for a union during nonworking time where efficiency was not compromised. By opening up his property to employees, the employer had yielded so much of his private property rights as to allow those employees to exercise § 7 rights under the National Labor Relations Act. But this Court also held that the private property rights of an owner prevailed over the intrusion of nonemployee organizers, even in nonworking areas of the plant and during nonworking hours. *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956).

The critical fact in this case is that entry over Mr. Barlow's objection is being sought by a Government agent.[8] Employees

---

[8] The Government has asked that Mr. Barlow be ordered to show cause why he should not be held in contempt for refusing to honor the inspection order, and its position is that the OSHA inspector is now entitled to enter at once, over Mr. Barlow's objection.

are not being prohibited from reporting OSHA violations. What they observe in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy. The Government inspector, however, is not an employee. Without a warrant he stands in no better position than a member of the public. What is observable by the public is observable, without a warrant, by the Government inspector as well.[9] The owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents. That an employee is free to report, and the Government is free to use, any evidence of noncompliance with OSHA that the employee observes furnishes no justification for federal agents to enter a place of business from which the public is restricted and to conduct their own warrantless search.[10]

## II

The Secretary nevertheless stoutly argues that the enforcement scheme of the Act requires warrantless searches, and that the restrictions on search discretion contained in the Act and its regulations already protect as much privacy as a warrant would. The Secretary thereby asserts the actual reasonableness of OSHA searches, whatever the general rule against warrantless searches might be. Because "reasonableness is still the ultimate standard," *Camara* v. *Municipal*

---

[9] Cf. *Air Pollution Variance Bd.* v. *Western Alfalfa Corp.*, 416 U. S. 861 (1974).

[10] The automobile-search cases cited by the Secretary are even less helpful to his position than the labor cases. The fact that automobiles occupy a special category in Fourth Amendment case law is by now beyond doubt due, among other factors, to the quick mobility of a car, the registration requirements of both the car and the driver, and the more available opportunity for plain-view observations of a car's contents. *Cady* v. *Dombrowski*, 413 U. S. 433, 441–442 (1973); see also *Chambers* v. *Maroney*, 399 U. S. 42, 48–51 (1970). Even so, probable cause has not been abandoned as a requirement for stopping and searching an automobile.

*Court,* 387 U. S., at 539, the Secretary suggests that the Court decide whether a warrant is needed by arriving at a sensible balance between the administrative necessities of OSHA inspections and the incremental protection of privacy of business owners a warrant would afford. He suggests that only a decision exempting OSHA inspections from the Warrant Clause would give "full recognition to the competing public and private interests here at stake." *Ibid.*

The Secretary submits that warrantless inspections are essential to the proper enforcement of OSHA because they afford the opportunity to inspect without prior notice and hence to preserve the advantages of surprise. While the dangerous conditions outlawed by the Act include structural defects that cannot be quickly hidden or remedied, the Act also regulates a myriad of safety details that may be amenable to speedy alteration or disguise. The risk is that during the interval between an inspector's initial request to search a plant and his procuring a warrant following the owner's refusal of permission, violations of this latter type could be corrected and thus escape the inspector's notice. To the suggestion that warrants may be issued *ex parte* and executed without delay and without prior notice, thereby preserving the element of surprise, the Secretary expresses concern for the administrative strain that would be experienced by the inspection system, and by the courts, should *ex parte* warrants issued in advance become standard practice.

We are unconvinced, however, that requiring warrants to inspect will impose serious burdens on the inspection system or the courts, will prevent inspections necessary to enforce the statute, or will make them less effective. In the first place, the great majority of businessmen can be expected in normal course to consent to inspection without warrant; the Secretary has not brought to this Court's attention any widespread pattern of refusal.[11] In those cases where an owner does insist

---

[11] We recognize that today's holding itself might have an impact on

on a warrant, the Secretary argues that inspection efficiency will be impeded by the advance notice and delay. The Act's penalty provisions for giving advance notice of a search, 29 U. S. C. § 666 (f), and the Secretary's own regulations, 29 CFR § 1903.6 (1977), indicate that surprise searches are indeed contemplated. However, the Secretary has also promulgated a regulation providing that upon refusal to permit an inspector to enter the property or to complete his inspection, the inspector shall attempt to ascertain the reasons for the refusal and report to his superior, who shall "promptly take appropriate action, including compulsory process, if necessary." 29 CFR § 1903.4 (1977).[12] The regulation represents a choice to pro-

whether owners choose to resist requested searches; we can only await the development of evidence not present on this record to determine how serious an impediment to effective enforcement this might be.

[12] It is true, as the Secretary asserts, that § 8 (a) of the Act, 29 U. S. C. § 657 (a), purports to authorize inspections without warrant; but it is also true that it does not forbid the Secretary from proceeding to inspect only by warrant or other process. The Secretary has broad authority to prescribe such rules and regulations as he may deem necessary to carry out his responsibilities under this chapter, "including rules and regulations dealing with the inspection of an employer's establishment." § 8 (g) (2), 29 U. S. C. § 657 (g) (2). The regulations with respect to inspections are contained in 29 CFR Part 1903 (1977). Section 1903.4, referred to in the text, provides as follows:

"Upon a refusal to permit a Compliance Safety and Health Officer, in the exercise of his official duties, to enter without delay and at reasonable times any place of employment or any place therein, to inspect, to review records, or to question any employer, owner, operator, agent, or employee, in accordance with § 1903.3, or to permit a representative of employees to accompany the Compliance Safety and Health Officer during the physical inspection of any workplace in accordance with § 1903.8, the Compliance Safety and Health Officer shall terminate the inspection or confine the inspection to other areas, conditions, structures, machines, apparatus, devices, equipment, materials, records, or interviews concerning which no objection is raised. The Compliance Safety and Health Officer shall endeavor to ascertain the reason for such refusal, and he shall immediately report the refusal and the reason therefor to the Area Director. The Area Director shall immediately consult with the Assistant Regional Direc-

ceed by process where entry is refused; and on the basis of evidence available from present practice, the Act's effectiveness has not been crippled by providing those owners who wish to refuse an initial requested entry with a time lapse while the inspector obtains the necessary process.[13]   Indeed, the kind of process sought in this case and apparently anticipated by the regulation provides notice to the business operator.[14]

---

tor and the Regional Solicitor, who shall promptly take appropriate action, including compulsory process, if necessary."

When his representative was refused admission by Mr. Barlow, the Secretary proceeded in federal court to enforce his right to enter and inspect, as conferred by 29 U. S. C. § 657.

[13] A change in the language of the Compliance Operations Manual for OSHA inspectors supports the inference that, whatever the Act's administrators might have thought at the start, it was eventually concluded that enforcement efficiency would not be jeopardized by permitting employers to refuse entry, at least until the inspector obtained compulsory process. The 1972 Manual included a section specifically directed to obtaining "warrants," and one provision of that section dealt with *ex parte* warrants:

"In cases where a refusal of entry is to be expected from the past performance of the employer, or where the employer has given some indication prior to the commencement of the investigation of his intention to bar entry or limit or interfere with the investigation, a warrant should be obtained before the inspection is attempted.   Cases of this nature should also be referred through the Area Director to the appropriate Regional Solicitor and the Regional Administrator alerted."   Dept. of Labor, OSHA Compliance Operations Manual V–7 (Jan. 1972).

The latest available manual, incorporating changes as of November 1977, deletes this provision, leaving only the details for obtaining "compulsory process" *after* an employer has refused entry.   Dept. of Labor, OSHA Field Operations Manual, Vol. V, pp. V–4–V–5.   In its present form, the Secretary's regulation appears to permit establishment owners to insist on "process"; and hence their refusal to permit entry would fall short of criminal conduct within the meaning of 18 U. S. C. §§ 111 and 1114 (1976 ed.), which make it a crime forcibly to impede, intimidate, or interfere with federal officials, including OSHA inspectors, while engaged in or on account of the performance of their official duties.

[14] The proceeding was instituted by filing an "Application for Affirmative Order to Grant Entry and for an Order to show cause why such affirmative

If this safeguard endangers the efficient administration of OSHA, the Secretary should never have adopted it, particularly when the Act does not require it.   Nor is it immediately

order should not issue."   The District Court issued the order to show cause, the matter was argued, and an order then issued authorizing the inspection and enjoining interference by Barlow's.   The following is the order issued by the District Court:

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the United States of America, United States Department of Labor, Occupational Safety and Health Administration, through its duly designated representative or representatives, are entitled to entry upon the premises known as Barlow's Inc., 225 West Pine, Pocatello, Idaho, and may go upon said business premises to conduct an inspection and investigation as provided for in Section 8 of the Occupational Safety and Health Act of 1970 (29 U. S. C. 651, *et seq.*), as part of an inspection program designed to assure compliance with that Act; that the inspection and investigation shall be conducted during regular working hours or at other reasonable times, within reasonable limits and in a reasonable manner, all as set forth in the regulations pertaining to such inspections promulgated by the Secretary of Labor, at 29 C. F. R., Part 1903; that appropriate credentials as representatives of the Occupational Safety and Health Administration, United States Department of Labor, shall be presented to the Barlow's Inc. representative upon said premises and the inspection and investigation shall be commenced as soon as practicable after the issuance of this Order and shall be completed within reasonable promptness; that the inspection and investigation shall extend to the establishment or other area, workplace, or environment where work is performed by employees of the employer, Barlow's Inc., and to all pertinent conditions, structures, machines, apparatus, devices, equipment, materials, and all other things therein (including but not limited to records, files, papers, processes, controls, and facilities) bearing upon whether Barlow's Inc. is furnishing to its employees employment and a place of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical harm to its employees, and whether Barlow's Inc. is complying with the Occupational Safety and Health Standards promulgated under the Occupational Safety and Health Act and the rules, regulations, and orders issued pursuant to that Act; that representatives of the Occupational Safety and Health Administration may, at the option of Barlow's Inc., be accompanied by one or more employees of Barlow's Inc., pursuant to Section 8 (e) of that Act; that Barlow's Inc., its agents, representatives,

apparent why the advantages of surprise would be lost if, after being refused entry, procedures were available for the Secretary to seek an *ex parte* warrant and to reappear at the premises without further notice to the establishment being inspected.[15]

Whether the Secretary proceeds to secure a warrant or other process, with or without prior notice, his entitlement to inspect will not depend on his demonstrating probable cause to believe that conditions in violation of OSHA exist on the premises. Probable cause in the criminal law sense is not required. For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation [16] but also on a showing that "reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment]." *Camara*

officers, and employees are hereby enjoined and restrained from in anyway whatsoever interfering with the inspection and investigation authorized by this Order and, further, Barlow's Inc. is hereby ordered and directed to, within five working days from the date of this Order, furnish a copy of this Order to its officers and managers, and, in addition, to post a copy of this Order at its employee's bulletin board located upon the business premises; and Barlow's Inc. is hereby ordered and directed to comply in all respects with this order and allow the inspection and investigation to take place without delay and forthwith."

[15] Insofar as the Secretary's statutory authority is concerned, a regulation expressly providing that the Secretary could proceed *ex parte* to seek a warrant or its equivalent would appear to be as much within the Secretary's power as the regulation currently in force and calling for "compulsory process."

[16] Section 8 (f) (1), 29 U. S. C. § 657 (f) (1), provides that employees or their representatives may give written notice to the Secretary of what they believe to be violations of safety or health standards and may request an inspection. If the Secretary then determines that "there are reasonable grounds to believe that such violation or danger exists, he shall make a special inspection in accordance with the provisions of this section as soon as practicable." The statute thus purports to authorize a warrantless inspection in these circumstances.

v. *Municipal Court,* 387 U. S., at 538. A warrant showing that a specific business has been chosen for an OSHA search on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources such as, for example, dispersion of employees in various types of industries across a given area, and the desired frequency of searches in any of the lesser divisions of the area, would protect an employer's Fourth Amendment rights.[17] We doubt that the consumption of enforcement energies in the obtaining of such warrants will exceed manageable proportions.

Finally, the Secretary urges that requiring a warrant for OSHA inspectors will mean that, as a practical matter, warrantless-search provisions in other regulatory statutes are also constitutionally infirm. The reasonableness of a warrantless search, however, will depend upon the specific enforcement needs and privacy guarantees of each statute. Some of the statutes cited apply only to a single industry, where regulations might already be so pervasive that a *Colonnade-Biswell* exception to the warrant requirement could apply. Some statutes already envision resort to federal-court enforcement when entry is refused, employing specific language in some cases [18] and general language in others.[19] In short, we base

---

[17] The Secretary, Brief for Petitioner 9 n. 7, states that the Barlow inspection was not based on an employee complaint but was a "general schedule" investigation. "Such general inspections," he explains, "now called Regional Programmed Inspections, are carried out in accordance with criteria based upon accident experience and the number of employees exposed in particular industries. U. S. Department of Labor, Occupational Safety and Health Administration, Field Operations Manual, *supra,* 1 CCH Employment Safety and Health Guide ¶ 4327.2 (1976)."

· [18] The Federal Metal and Nonmetallic Mine Safety Act provides: "Whenever an operator . . . refuses to permit the inspection or investigation of any mine which is subject to this chapter . . . a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the

ɩ

today's opinion on the facts and law concerned with OSHA and do not retreat from a holding appropriate to that statute because of its real or imagined effect on other, different administrative schemes.

Nor do we agree that the incremental protections afforded the employer's privacy by a warrant are so marginal that they fail to justify the administrative burdens that may be entailed.

Secretary in the district court of the United States for the district . . . ." 30 U. S. C. § 733 (a). "The Secretary may institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order in the district court . . . whenever such operator or his agent . . . refuses to permit the inspection of the mine . . . . Each court shall have jurisdiction to provide such relief as may be appropriate." 30 U. S. C. § 818. Another example is the Clean Air Act, which grants federal district courts jurisdiction "to require compliance" with the Administrator of the Environmental Protection Agency's attempt to inspect under 42 U. S. C. § 7414 (1976 ed., Supp. I), when the Administrator has commenced "a civil action" for injunctive relief or to recover a penalty. 42 U. S. C. § 7413 (b) (4) (1976 ed., Supp. I).

[19] Exemplary language is contained in the Animal Welfare Act of 1970 which provides for inspections by the Secretary of Agriculture; federal district courts are vested with jurisdiction "specifically to enforce, and to prevent and restrain violations of this chapter, and shall have jurisdiction in all other kinds of cases arising under this chapter." 7 U. S. C. § 2146 (c) (1976 ed.). Similar provisions are included in other agricultural inspection Acts; see, e. g., 21 U. S. C. § 674 (meat product inspection); 21 U. S. C. § 1050 (egg product inspection). The Internal Revenue Code, whose excise tax provisions requiring inspections of businesses are cited by the Secretary, provides: "The district courts . . . shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction . . . and such other orders and processes, and to render such . . . decrees as may be necessary or appropriate for the enforcement of the internal revenue laws." 26 U. S. C. § 7402 (a). For gasoline inspections, federal district courts are granted jurisdiction to restrain violations and enforce standards (one of which, 49 U. S. C. § 1677, requires gas transporters to permit entry or inspection). The owner is to be afforded the opportunity for notice and response in most cases, but "failure to give such notice and afford such opportunity shall not preclude the granting of appropriate relief [by the district court]." 49 U. S. C. § 1679 (a).

The authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search. A warrant, by contrast, would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria.[20] Also, a warrant would then and there advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed.[21] These are important functions for a warrant to perform, functions which underlie the Court's prior decisions that the Warrant Clause applies to

---

[20] The application for the inspection order filed by the Secretary in this case represented that "the desired inspection and investigation are contemplated as a part of an inspection program designed to assure compliance with the Act and are authorized by Section 8 (a) of the Act." The program was not described, however, or any facts presented that would indicate why an inspection of Barlow's establishment was within the program. The order that issued concluded generally that the inspection authorized was "part of an inspection program designed to assure compliance with the Act."

[21] Section 8 (a) of the Act, as set forth in 29 U. S. C. § 657 (a), provides that "[i]n order to carry out the purposes of this chapter" the Secretary may enter any establishment, area, work place or environment "where work is performed by an employee of an employer" and "inspect and investigate" any such place of employment and all "pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein, and . . . question privately any such employer, owner, operator, agent, or employee." Inspections are to be carried out "during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner." The Secretary's regulations echo the statutory language in these respects. 29 CFR § 1903.3 (1977). They also provide that inspectors are to explain the nature and purpose of the inspection and to "indicate generally the scope of the inspection." 29 CFR § 1903.7 (a) (1977). Environmental samples and photographs are authorized, 29 CFR § 1903.7 (b) (1977), and inspections are to be performed so as "to preclude unreasonable disruption of the operations of the employer's establishment." 29 CFR § 1903.7 (d) (1977). The order that issued in this case reflected much of the foregoing statutory and regulatory language.

inspections for compliance with regulatory statutes.[22] *Camara v. Municipal Court,* 387 U. S. 523 (1967); *See v. Seattle,* 387 U. S. 541 (1967). We conclude that the concerns expressed by the Secretary do not suffice to justify warrantless inspections under OSHA or vitiate the general constitutional requirement that for a search to be reasonable a warrant must be obtained.

---

[22] Delineating the scope of a search with some care is particularly important where documents are involved. Section 8 (c) of the Act, 29 U. S. C. § 657 (c), provides that an employer must "make, keep and preserve, and make available to the Secretary [of Labor] or to the Secretary of Health, Education and Welfare" such records regarding his activities relating to OSHA as the Secretary of Labor may prescribe by regulation as necessary or appropriate for enforcement of the statute or for developing information regarding the causes and prevention of occupational accidents and illnesses. Regulations requiring employers to maintain records of and to make periodic reports on "work-related deaths, injuries and illnesses" are also contemplated, as are rules requiring accurate records of employee exposures to potential toxic materials and harmful physical agents.

In describing the scope of the warrantless inspection authorized by the statute, § 8 (a) does not expressly include any *records* among those items or things that may be examined, and § 8 (c) merely provides that the employer is to "make available" his pertinent records and to make periodic reports.

The Secretary's regulation, 29 CFR § 1903.3 (1977), however, expressly includes among the inspector's powers the authority "to review records required by the Act and regulations published in this chapter, and other records which are directly related to the purpose of the inspection." Further, § 1903.7 requires inspectors to indicate generally "the records specified in § 1903.3 which they wish to review" but "such designations of records shall not preclude access to additional records specified in § 1903.3." It is the Secretary's position, which we reject, that an inspection of documents of this scope may be effected without a warrant.

The order that issued in this case included among the objects and things to be inspected "all other things therein (including but not limited to records, files, papers, processes, controls and facilities) bearing upon whether Barlow's, Inc. is furnishing to its employees employment and a place of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical harm to its employees, and whether Barlow's, Inc. is complying with . . ." the OSHA regulations.

## III

We hold that Barlow's was entitled to a declaratory judgment that the Act is unconstitutional insofar as it purports to authorize inspections without warrant or its equivalent and to an injunction enjoining the Act's enforcement to that extent.[23] The judgment of the District Court is therefore affirmed.

*So ordered.*

Mr. Justice Brennan took no part in the consideration or decision of this case.

Mr. Justice Stevens, with whom Mr. Justice Blackmun and Mr. Justice Rehnquist join, dissenting.

Congress enacted the Occupational Safety and Health Act to safeguard employees against hazards in the work areas of businesses subject to the Act. To ensure compliance, Congress authorized the Secretary of Labor to conduct routine, nonconsensual inspections. Today the Court holds that the Fourth Amendment prohibits such inspections without a warrant. The Court also holds that the constitutionally required warrant may be issued without any showing of probable cause. I disagree with both of these holdings.

The Fourth Amendment contains two separate Clauses, each

---

[23] The injunction entered by the District Court, however, should not be understood to forbid the Secretary from exercising the inspection authority conferred by § 8 pursuant to regulations and judicial process that satisfy the Fourth Amendment. The District Court did not address the issue whether the order for inspection that was issued in this case was the functional equivalent of a warrant, and the Secretary has limited his submission in this case to the constitutionality of a warrantless search of the Barlow establishment authorized by § 8 (a). He has expressly declined to rely on 29 CFR § 1903.4 (1977) and upon the order obtained in this case. Tr. of Oral Arg. 19. Of course, if the process obtained here, or obtained in other cases under revised regulations, would satisfy the Fourth Amendment, there would be no occasion for enjoining the inspections authorized by § 8 (a).

flatly prohibiting a category of governmental conduct. The first Clause states that the right to be free from unreasonable searches "shall not be violated"; [1] the second unequivocally prohibits the issuance of warrants except "upon probable cause." [2] In this case the ultimate question is whether the category of warrantless searches authorized by the statute is "unreasonable" within the meaning of the first Clause.

In cases involving the investigation of criminal activity, the Court has held that the reasonableness of a search generally depends upon whether it was conducted pursuant to a valid warrant. See, e. g., *Coolidge* v. *New Hampshire,* 403 U. S. 443. There is, however, also a category of searches which are reasonable within the meaning of the first Clause even though the probable-cause requirement of the Warrant Clause cannot be satisfied. See *United States* v. *Martinez-Fuerte,* 428 U. S. 543; *Terry* v. *Ohio,* 392 U. S. 1; *South Dakota* v. *Opperman,* 428 U. S. 364; *United States* v. *Biswell,* 406 U. S. 311. The regulatory inspection program challenged in this case, in my judgment, falls within this category.

## I

The warrant requirement is linked "textually . . . to the probable-cause concept" in the Warrant Clause. *South Dakota* v. *Opperman, supra,* at 370 n. 5. The routine OSHA inspections are, by definition, not based on cause to believe there is a violation on the premises to be inspected. Hence, if the inspections were measured against the requirements of the Warrant Clause, they would be automatically and unequivocally unreasonable.

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

[2] "[A]nd no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Because of the acknowledged importance and reasonableness of routine inspections in the enforcement of federal regulatory statutes such as OSHA, the Court recognizes that requiring full compliance with the Warrant Clause would invalidate all such inspection programs. Yet, rather than simply analyzing such programs under the "Reasonableness" Clause of the Fourth Amendment, the Court holds the OSHA program invalid under the Warrant Clause and then avoids a blanket prohibition on all routine, regulatory inspections by relying on the notion that the "probable cause" requirement in the Warrant Clause may be relaxed whenever the Court believes that the governmental need to conduct a category of "searches" outweighs the intrusion on interests protected by the Fourth Amendment.

The Court's approach disregards the plain language of the Warrant Clause and is unfaithful to the balance struck by the Framers of the Fourth Amendment—"the one procedural safeguard in the Constitution that grew directly out of the events which immediately preceded the revolutionary struggle with England." [3] This preconstitutional history includes the controversy in England over the issuance of general warrants to aid enforcement of the seditious libel laws and the colonial experience with writs of assistance issued to facilitate collection of the various import duties imposed by Parliament. The Framers' familiarity with the abuses attending the issuance of such general warrants provided the principal stimulus for the restraints on arbitrary governmental intrusions embodied in the Fourth Amendment.

> "[O]ur constitutional fathers were not concerned about warrantless searches, but about overreaching warrants. It is perhaps too much to say that they feared the warrant more than the search, but it is plain enough that the warrant was the prime object of their concern. Far from

---

[3] J. Landynski, Search and Seizure and the Supreme Court 19 (1966).

looking ·at the warrant as a protection against unreasonable searches, they saw it as an authority for unreasonable and oppressive searches . . . ." [4]

Since the general warrant, not the warrantless search, was the immediate evil at which the Fourth Amendment was directed, it is not surprising that the Framers placed precise limits on its issuance. The requirement that a warrant only issue on a showing of particularized probable cause was the means adopted to circumscribe the warrant power. While the subsequent course of Fourth Amendment jurisprudence in this Court emphasizes the dangers posed by warrantless searches conducted without probable cause, it is the general reasonableness standard in the first Clause, not the Warrant Clause, that the Framers adopted to limit this category of searches. It is, of course, true that the existence of a valid warrant normally satisfies the reasonableness requirement under the Fourth Amendment. But we should not dilute the requirements of the Warrant Clause in an effort to force every kind of governmental intrusion which satisfies the Fourth Amendment definition of a "search" into a judicially developed, warrant-preference scheme.

Fidelity to the original understanding of the Fourth Amendment, therefore, leads to the conclusion that the Warrant Clause has no application to routine, regulatory inspections of commercial premises. If such inspections are valid, it is because they comport with the ultimate reasonableness standard of the Fourth Amendment. If the Court were correct in its view that such inspections, if undertaken without a warrant, are unreasonable in the constitutional sense, the issuance of a "new-fangled warrant"—to use Mr. Justice Clark's characteristically expressive term—without any true showing of particularized probable cause would not be sufficient to validate them.[5]

---

[4] T. Taylor, Two Studies in Constitutional Interpretation 41 (1969).

[5] *See* v. *Seattle,* 387 U. S. 541, 547 (Clark, J., dissenting).

## II

Even if a warrant issued without probable cause were faithful to the Warrant Clause, I could not accept the Court's holding that the Government's inspection program is constitutionally unreasonable because it fails to require such a warrant procedure. In determining whether a warrant is a necessary safeguard in a given class of cases, "the Court has weighed the public interest against the Fourth Amendment interest of the individual . . . ." *United States* v. *Martinez-Fuerte,* 428 U. S., at 555. Several considerations persuade me that this balance should be struck in favor of the routine inspections authorized by Congress.

Congress has determined that regulation and supervision of safety in the workplace furthers an important public interest and that the power to conduct warrantless searches is necessary to accomplish the safety goals of the legislation. In assessing the public interest side of the Fourth Amendment balance, however, the Court today substitutes its judgment for that of Congress on the question of what inspection authority is needed to effectuate the purposes of the Act. The Court states that if surprise is truly an important ingredient of an effective, representative inspection program, it can be retained by obtaining *ex parte* warrants in advance. The Court assures the Secretary that this will not unduly burden enforcement resources because most employers will consent to inspection.

The Court's analysis does not persuade me that Congress' determination that the warrantless-inspection power as a necessary adjunct of the exercise of the regulatory power is unreasonable. It was surely not unreasonable to conclude that the rate at which employers deny entry to inspectors would increase if covered businesses, which may have safety violations on their premises, have a right to deny warrantless entry to a compliance inspector. The Court is correct that this problem could be avoided by requiring inspectors to obtain a warrant prior to every inspection visit. But the adoption of

such a practice undercuts the Court's explanation of why a warrant requirement would not create undue enforcement problems. For, even if it were true that many employers would not exercise their right to demand a warrant, it would provide little solace to those charged with administration of OSHA; faced with an increase in the rate of refusals and the added costs generated by futile trips to inspection sites where entry is denied, officials may be compelled to adopt a general practice of obtaining warrants in advance. While the Court's prediction of the effect a warrant requirement would have on the behavior of covered employers may turn out to be accurate, its judgment is essentially empirical. On such an issue, I would defer to Congress' judgment regarding the importance of a warrantless-search power to the OSHA enforcement scheme.

The Court also appears uncomfortable with the notion of second-guessing Congress and the Secretary on the question of how the substantive goals of OSHA can best be achieved. Thus, the Court offers an alternative explanation for its refusal to accept the legislative judgment. We are told that, in any event, the Secretary, who is charged with enforcement of the Act, has indicated that inspections without delay· are not essential to the enforcement scheme. The Court bases this conclusion on a regulation prescribing the administrative response when a compliance inspector is denied entry. It provides: "The Area Director shall immediately consult with the Assistant Regional Director and the Regional Solicitor, who shall promptly take appropriate action, including compulsory process, if necessary." 29 CFR § 1903.4 (1977). The Court views this regulation as an admission by the Secretary that no enforcement problem is generated by permitting employers to deny entry and delaying the inspection until a warrant has been obtained. I disagree. The regulation was promulgated against the background of a statutory right to immediate entry, of which covered employers are presumably

aware and which Congress and the Secretary obviously thought would keep denials of entry to a minimum. In these circumstances, it was surely not unreasonable for the Secretary to adopt an orderly procedure for dealing with what he believed would be the occasional denial of entry. The regulation does not imply a judgment by the Secretary that delay caused by numerous denials of entry would be administratively acceptable.

Even if a warrant requirement does not "frustrate" the legislative purpose, the Court has no authority to impose an additional burden on the Secretary unless that burden is required to protect the employer's Fourth Amendment interests.[6] The essential function of the traditional warrant requirement is the interposition of a neutral magistrate between the citizen and the presumably zealous law enforcement officer so that there might be an objective determination of probable cause. But this purpose is not served by the newfangled inspection warrant. As the Court acknowledges, the inspector's "entitlement to inspect will not depend on his demonstrating probable cause to believe that conditions in violation of OSHA exist on the premises. . . . For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based . . . on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].' " *Ante,* at 320. To obtain a warrant, the inspector need only show that "a specific business has been chosen for an OSHA search on the basis of a general administrative plan for the enforcement of the Act derived

---

[6] When it passed OSHA, Congress was cognizant of the fact that in light of the enormity of the enforcement task "the number of inspections which it would be desirable to have made will undoubtedly for an unforeseeable period, exceed the capacity of the inspection force . . . ." Senate Committee on Labor and Public Welfare, Legislative History of the Occupational Safety and Health Act of 1970, 92d Cong., 1st Sess., 152 (Comm. Print 1971).

from neutral sources . . . ." *Ante,* at 321. Thus, the only question for the magistrate's consideration is whether the contemplated inspection deviates from an inspection schedule drawn up by higher level agency officials.

Unlike the traditional warrant, the inspection warrant provides no protection against the search itself for employers who the Government has no reason to suspect are violating OSHA regulations. The Court plainly accepts the proposition that random health and safety inspections are reasonable. It does not question Congress' determination that the public interest in workplaces free from health and safety hazards outweighs the employer's desire to conduct his business only in the presence of permittees, except in those rare instances when the Government has probable cause to suspect that the premises harbor a violation of the law.

What purposes, then, are served by the administrative warrant procedure? The inspection warrant purports to serve three functions: to inform the employer that the inspection is authorized by the statute, to advise him of the lawful limits of the inspection, and to assure him that the person demanding entry is an authorized inspector. *Camara* v. *Municipal Court,* 387 U. S. 523, 532. An examination of these functions in the OSHA context reveals that the inspection warrant adds little to the protections already afforded by the statute and pertinent regulations, and the slight additional benefit it might provide is insufficient to identify a constitutional violation or to justify overriding Congress' judgment that the power to conduct warrantless inspections is essential.

The inspection warrant is supposed to assure the employer that the inspection is in fact routine, and that the inspector has not improperly departed from the program of representative inspections established by responsible officials. But to the extent that harassment inspections would be reduced by the necessity of obtaining a warrant, the Secretary's present enforcement scheme would have precisely the same effect.

The representative inspections are conducted " 'in accordance with criteria based upon accident experience and the number of employees exposed in particular industries.' " *Ante,* at 321 n. 17. If, under the present scheme, entry to covered premises is denied, the inspector can gain entry only by informing his administrative superiors of the refusal and seeking a court order requiring the employer to submit to the inspection. The inspector who would like to conduct a nonroutine search is just as likely to be deterred by the prospect of informing his superiors of his intention and of making false representations to the court when he seeks compulsory process as by the prospect of having to make bad-faith representations in an *ex parte* warrant proceeding.

The other two asserted purposes of the administrative warrant are also adequately achieved under the existing scheme. If the employer has doubts about the official status of the inspector, he is given adequate opportunity to reassure himself in this regard before permitting entry. The OSHA inspector's statutory right to enter the premises is conditioned upon the presentation of appropriate credentials. 29 U. S. C. § 657 (a)(1). These credentials state the inspector's name, identify him as an OSHA compliance officer, and contain his photograph and signature. If the employer still has doubts, he may make a toll-free call to verify the inspector's authority, *Usery* v. *Godfrey Brake & Supply Service, Inc.,* 545 F. 2d 52, 54 (CA8 1976), or simply deny entry and await the presentation of a court order.

The warrant is not needed to inform the employer of the lawful limits of an OSHA inspection. The statute expressly provides that the inspector may enter all areas in a covered business "where work is performed by an employee of an employer," 29 U. S. C. § 657 (a)(1), "to inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner . . . all pertinent conditions, structures, machines, appa-

ratus, devices, equipment, and materials therein . . . ." 29 U. S. C. § 657 (a)(2). See also 29 CFR § 1903 (1977). While it is true that the inspection power granted by Congress is broad, the warrant procedure required by the Court does not purport to restrict this power but simply to ensure that the employer is apprised of its scope. Since both the statute and the pertinent regulations perform this informational function, a warrant is superfluous.

Requiring the inspection warrant, therefore, adds little in the way of protection to that already provided under the existing enforcement scheme. In these circumstances, the warrant is essentially a formality. In view of the obviously enormous cost of enforcing a health and safety scheme of the dimensions of OSHA, this Court should not, in the guise of construing the Fourth Amendment, require formalities which merely place an additional strain on already overtaxed federal resources.

Congress, like this Court, has an obligation to obey the mandate of the Fourth Amendment. In the past the Court "has been particularly sensitive to the Amendment's broad standard of 'reasonableness' where . . . authorizing statutes permitted the challenged searches." *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 290 (WHITE, J., dissenting). In *United States* v. *Martinez-Fuerte,* 428 U. S. 543, for example, respondents challenged the routine stopping of vehicles to check for aliens at permanent checkpoints located away from the border. The checkpoints were established pursuant to statutory authority and their location and operation were governed by administrative criteria. The Court rejected respondents' argument that the constitutional reasonableness of the location and operation of the fixed checkpoints should be reviewed in a *Camara* warrant proceeding. The Court observed that the reassuring purposes of the inspection warrant were adequately served by the visible manifestations of authority exhibited at the fixed checkpoints.

Moreover, although the location and method of operation of the fixed checkpoints were deemed critical to the constitutional reasonableness of the challenged stops, the Court did not require Border Patrol officials to obtain a warrant based on a showing that the checkpoints were located and operated in accordance with administrative standards. Indeed, the Court observed that "[t]he choice of checkpoint locations must be left largely to the discretion of Border Patrol officials, to be exercised in accordance with statutes and regulations that may be applicable . . . [and] [m]any incidents of checkpoint operation also must be committed to the discretion of such officials." 428 U. S., at 559–560, n. 13. The Court had no difficulty assuming that those officials responsible for allocating limited enforcement resources would be "unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class." *Id.*, at 559.

The Court's recognition of Congress' role in balancing the public interest advanced by various regulatory statutes and the private interest in being free from arbitrary governmental intrusion has not been limited to situations in which, for example, Congress is exercising its special power to exclude aliens. Until today, we have not rejected a congressional judgment concerning the reasonableness of a category of regulatory inspections of commercial premises.[7] While businesses are unquestionably entitled to Fourth Amendment protection, we have "recognized that a business, by its special nature and voluntary existence, may open itself to intrusions that would not be permissible in a purely private context."

---

[7] The Court's rejection of a legislative judgment regarding the reasonableness of the OSHA inspection program is especially puzzling in light of recent decisions finding law enforcement practices constitutionally reasonable, even though those practices involved significantly more individual discretion than the OSHA program. See, *e. g., Terry* v. *Ohio,* 392 U. S. 1; *Adams* v. *Williams,* 407 U. S. 143; *Cady* v. *Dombrowski,* 413 U. S. 433; *South Dakota* v. *Opperman,* 428 U. S. 364.

*G. M. Leasing Corp.* v. *United States,* 429 U. S. 338, 353. Thus, in *Colonnade Catering Corp.* v. *United States,* 397 U. S. 72, the Court recognized the reasonableness of a statutory authorization to inspect the premises of a caterer dealing in alcoholic beverages, noting that "Congress has broad power to design such powers of inspection under the liquor laws as it deems necessary to meet the evils at hand." *Id.,* at 76. And in *United States* v. *Biswell,* 406 U. S. 311, the Court sustained the authority to conduct warrantless searches of firearm dealers under the Gun Control Act of 1968 primarily on the basis of the reasonableness of the congressional evaluation of the interests at stake.[8]

The Court, however, concludes that the deference accorded Congress in *Biswell* and *Colonnade* should be limited to situations where the evils addressed by the regulatory statute are peculiar to a specific industry and that industry is one which has long been subject to Government regulation. The Court reasons that only in those situations can it be said that a person who engages in business will be aware of and consent to routine, regulatory inspections. I cannot agree that the respect due the congressional judgment should be so narrowly confined.

In the first place, the longevity of a regulatory program does not, in my judgment, have any bearing on the reasonableness of routine inspections necessary to achieve adequate enforcement of that program. Congress' conception of what constitute

---

[8] The Court held:

"In the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends . . . on the authority of a valid statute.

.          .          .          .          .

"We have little difficulty in concluding that where, as here, regulatory inspections further urgent federal interest, and the possibilities of abuse and the threat to privacy are not of impressive dimensions, the inspection may proceed without a warrant where specifically authorized by statute." 406 U. S., at 315, 317.

urgent federal interests need not remain static. The recent vintage of public and congressional awareness of the dangers posed by health and safety hazards in the workplace is not a basis for according less respect to the considered judgment of Congress. Indeed, in *Biswell,* the Court upheld an inspection program authorized by a regulatory statute enacted in 1968. The Court there noted that "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry, but close scrutiny of this traffic is undeniably" an urgent federal interest. 406 U. S., at 315. Thus, the critical fact is the congressional determination that federal regulation would further significant public interests, not the date that determination was made.

In the second place, I see no basis for the Court's conclusion that a congressional determination that a category of regulatory inspections is reasonable need only be respected when Congress is legislating on an industry-by-industry basis. The pertinent inquiry is not whether the inspection program is authorized by a regulatory statute directed at a single industry, but whether Congress has limited the exercise of the inspection power to those commercial premises where the evils at which the statute is directed are to be found. Thus, in *Biswell,* if Congress had authorized inspections of all commercial premises as a means of restricting the illegal traffic in firearms, the Court would have found the inspection program unreasonable; the power to inspect was upheld because it was tailored to the subject matter of Congress' proper exercise of regulatory power. Similarly, OSHA is directed at health and safety hazards in the workplace, and the inspection power granted the Secretary extends only to those areas where such hazards are likely to be found.

Finally, the Court would distinguish the respect accorded Congress' judgment in *Colonnade* and *Biswell* on the ground that businesses engaged in the liquor and firearms industry " 'accept the burdens as well as the benefits of their trade . . . .' "

*Ante,* at 313. In the Court's view, such businesses consent to the restrictions placed upon them, while it would be fiction to conclude that a businessman subject to OSHA consented to routine safety inspections. In fact, however, consent is fictional in both contexts. Here, as well as in *Biswell,* businesses are required to be aware of and comply with regulations governing their business activities. In both situations, the validity of the regulations depends not upon the consent of those regulated, but on the existence of a federal statute embodying a congressional determination that the public interest in the health of the Nation's work force or the limitation of illegal firearms traffic outweighs the businessman's interest in preventing a Government inspector from viewing those areas of his premises which relate to the subject matter of the regulation.

The case before us involves an attempt to conduct a warrantless search of the working area of an electrical and plumbing contractor. The statute authorizes such an inspection during reasonable hours. The inspection is limited to those areas over which Congress has exercised its proper legislative authority.[9] The area is also one to which employees

---

[9] What the Court actually decided in *Camara* v. *Municipal Court,* 387 U. S. 523, and *See* v. *Seattle,* 387 U. S. 541, does not require the result it reaches today. *Camara* involved a residence, rather than a business establishment; although the Fourth Amendment extends its protection to commercial buildings, the central importance of protecting residential privacy is manifest. The building involved in *See* was, of course, a commercial establishment, but a holding that a locked warehouse may not be entered pursuant to a general authorization to "enter all buildings and premises, except the interior of dwellings, as often as may be necessary," 387 U. S., at 541, need not be extended to cover more carefully delineated grants of authority. My view that the *See* holding should be narrowly confined is influenced by my favorable opinion of the dissent written by Mr. Justice Clark and joined by Justices Harlan and STEWART. As *Colonnade* and *Biswell* demonstrate, however, the doctrine of *stare decisis* does not compel the Court to extend those cases to govern today's holding.

have regular access without any suggestion that the work performed or the equipment used has any special claim to confidentiality.[10] Congress has determined that industrial safety is an urgent federal interest requiring regulation and supervision, and further, that warrantless inspections are necessary to accomplish the safety goals of the legislation. While one may question the wisdom of pervasive governmental oversight of industrial life, I decline to question Congress' judgment that the inspection power is a necessary enforcement device in achieving the goals of a valid exercise of regulatory power.[11]

I respectfully dissent.

---

[10] The Act and pertinent regulation provide protection for any trade secrets of the employer. 29 U. S. C. §§ 664–665; 29 CFR § 1903.9 (1977).

[11] The decision today renders presumptively invalid numerous inspection provisions in federal regulatory statutes. *E. g.*, 30 U. S. C. § 813 (Federal Coal Mine Health and Safety Act of 1969); 30 U. S. C. §§ 723, 724 (Federal Metal and Nonmetallic Mine Safety Act); 21 U. S. C. § 603 (inspection of meat and food products). That some of these provisions apply only to a single industry, as noted above, does not alter this fact. And the fact that some "envision resort to federal-court enforcement when entry is refused" is also irrelevant since the OSHA inspection program invalidated here requires compulsory process when a compliance inspector has been denied entry. *Ante*, at 321.