TIME WARNER ENTERTAINMENT
COMPANY, L.P., et ano.,
Plaintiffs,

v.

Jane DOES # 1–2 and John Does
# 1–10, Defendants.

No. CV–94–5713 (CPS).

United States District Court,
E.D. New York.

Dec. 19, 1994.

Gibney, Anthony & Flaherty, New York City, for plaintiffs.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

In this action for copyright infringement and violation of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, plaintiffs apply *ex parte* for a preliminary injunction and an order of seizure. Plaintiffs request that this Court authorize a private investigative service to break into and enter the residence and business location of two named defendants and to search for, seize, and impound apparel and other products allegedly infringing plaintiffs' copyrighted designs and trademarks.[1] Plaintiffs also request that the Court files in this case be maintained under seal until the seizure order is granted. For the following reasons, plaintiffs' *ex parte* application for an order of seizure is denied. The application to seal the Court files created in this case (with the exception of this opinion) is granted, subject to further order of this or any reviewing court.

### BACKGROUND

Plaintiffs allege that defendants are manufacturing, selling, or otherwise distributing merchandise bearing plaintiffs' copyrighted designs and trademarks without authorization. In support of their application, the plaintiffs have provided (1) the declaration of Nils Victor Montan, a vice president at the Warner Bros. division of Time–Warner, (2) the declaration of Angela Small, a vice president at Saban Entertainment, (3) the declaration of the president of a private investigative agency retained by the plaintiffs, and (4) the declaration of plaintiffs' attorney. Annexed to these affidavits and to the complaint are numerous photocopies depicting the plaintiffs' marks. Plaintiffs have also provided a T-shirt allegedly obtained from one of the defendants.

From these papers, submitted *ex parte*, it appears that plaintiff Time Warner Entertainment Company ("Warner") is the owner of all copyrights, trademarks, and other proprietary rights in and to the internationally famous Looney Tunes characters, among

---

1. The application seeks much more as noted below, including like authority for the United States Marshal the New York City police and any other law enforcement agency, should plaintiffs' lawyers choose to use them.

which are Bugs Bunny, Daffy Duck, Tazmanian Devil, Wile E. Coyote, Yosemite Sam, Foghorn Leghorn, Sylvester, Sylvester Jr., Henery Hawk, Road Runner, Porky Pig, Speedy Gonzales, and Tweety. Since as early as 1930, Warner has produced and distributed hundreds of animated copyrighted cartoons with the Looney Tunes characters. In addition, Warner has sold and licensed merchandised apparel and other goods bearing Warner's copyrighted and trademarked Looney Tunes characters.

Plaintiff Saban Entertainment, Inc. ("Saban") is engaged in the business of producing and distributing live action television programs. Among these programs is the internationally famous live action television program series "Mighty Morphin Power Rangers." Saban is the exclusive owner in the United States of all copyrights, trademarks, and other proprietary rights in the Mighty Morphin Power Rangers. The Mighty Morphin characters have appeared in over 80 episodes produced and distributed by Saban. Moreover, Saban has authorized and licensed the manufacture and sale of numerous products, including toys and apparel, bearing Saban's copyrighted and trademarked Mighty Morphin characters.[2]

Both plaintiffs state that their marks have been subject to extensive counterfeiting by unidentified third parties as a result of the wide popularity of the characters. Their attorney states that in his experience these counterfeiters "often" hide or remove merchandise and assets when aware that a court proceeding is imminent.

Defendant Jane Doe 1 is a person identified by name in the sealed affidavits who allegedly does business in Flushing, New York. Defendant Jane Doe 2 is a business entity located in Brooklyn, New York. The names and, indeed, the existence of defendants John Does 1 through 10 are unknown to plaintiffs and the Court at this time. They are described as entities or individuals who are principals, supervisory employees, or suppliers of defendants Jane Does 1 and 2.

According to the declaration of plaintiffs' investigative firm, an investigator visited defendant Jane Doe 1's premises, which includes what is described as Jane Doe 1's residence, in September 1994, some two months ago. The investigator was taken to the back of a commercial establishment and went through a trap door to a basement showroom where the investigator saw a screen printing facility in the room next door and purchased from defendant Jane Doe 1 two dozen T-shirts bearing Saban's Mighty Morphin Power Ranger mark and copyrighted design. One of these T-shirts is apparently that submitted with plaintiffs' papers. An investigator called defendant Jane Doe 1 in November 1994 to inquire about purchasing Looney Tunes items but was told that the items were sold out and to call back since "they go very quickly." An investigator returned to Jane Doe 1's premises in December 1994 and observed apparel bearing plaintiffs' Looney Tunes and Mighty Morphin copyrighted designs and trademarks. The investigator was unable to purchase any products at that time, as the person with whom the investigator spoke stated he would not sell merchandise to people he did not know.

An investigator visited defendant Jane Doe 2's premises in November 1994 and observed T-shirts bearing plaintiffs' Looney Tunes copyrighted designs and trademarks. The declarations submitted by plaintiffs' investigator allege that defendant Jane Doe 2 is a screen printing operation that manufactures counterfeit merchandise for a wholesaler, but the declarations do not indicate the investigator's basis for this assertion. In December 1994, an investigator returned to defendant Jane Doe 2's premises but was unable to gain access to the building in which defendant was located, which are (or were) protected by security cameras and include a garage and storage facility and contain printing machines and dryers.

On this showing, plaintiffs seek an order (i) directing the U.S. Marshal, other law enforcement officials, or plaintiffs' security firm

---

**2.** According to both plaintiffs, "[a] significant portion of [their] business has been the creation and commercial exploitation of [these] Characters in connection with the sale of products through licensees, including apparel." Montan Decl. ¶ 8; Small Decl. ¶ 7.

the right to break into and enter defendants' premises (one of which is a home) as well as "any location in New York [sic] where counterfeit or infringing merchandise ... is manufactured, distributed, sold ... and stored" to search for, inventory, and seize any infringing goods, materials, and machinery used to make such goods and any business records detailing the purchase or sale of such infringing goods, (ii) granting expedited discovery of defendants with respect to their manufacture, receipt, and sale of goods bearing plaintiffs' copyrighted designs and marks, and (iii) temporarily restraining defendants from infringing plaintiffs' copyrights and trademarks, destroying the infringing goods, and destroying any other materials used to make the infringing goods or any business records detailing the sale or purchase of such goods, and from communicating about this order to anyone other than their attorneys.

In the proposed order, plaintiffs thus seek authorization to search defendants' premises and inventory and seize any infringing products bearing likenesses of plaintiffs' copyrighted designs and trademarks. The order does not define what copyrighted designs and trademarks are to be looked for, but rather refers back generally to plaintiffs' other papers. In addition to seizing such infringing products, plaintiffs seek authorization to seize any materials or equipment that can be used to manufacture infringing products. Plaintiffs also seek authorization to seize any business records "believed to concern the manufacture, distribution, purchase, advertising, sale or offering for sale of any labels, tags, logos, decals, emblems, or other markings and any products bearing Plaintiffs' Copyrighted Designs and/or Trademarks."

Plaintiffs request authorization for their investigators to break into and enter the premises to be searched, including locked or unlocked vehicles, rooms, closets, cabinets, containers and desks.

Finally, an order is sought directing defendants to give the individuals conducting the search their correct name, residential address, and telephone number.

## DISCUSSION

Proceeding under the authority of the Lanham Act, 15 U.S.C. § 1114 *et seq.,* and the Copyright Act of 1976, 17 U.S.C. § 501 *et seq.,* plaintiffs seek an order of extraordinary scope to say the least. Because of this, the order deserves a more detailed review than such orders often receive.

Under the Copyright Act of 1976, impoundment is authorized by Section 503(a), which states:

At any time while an action under this title is pending, the court may order the impounding, on such terms as it may deem reasonable, of all copies ... claimed to have been made or used in violation of the copyright owner's exclusive rights, and of all plates, molds, matrices, masters, tapes, film negatives, or other articles by means of which such copies ... may be reproduced.

17 U.S.C. § 503(a).

Similarly, where a violation of the Lanham Act is shown with respect to a counterfeit mark, the Act authorizes a "seizure of goods and counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale or receipt of things involved in the violation." 15 U.S.C. § 1116.

■ Where plaintiffs have shown that a danger exists of destroying or transferring infringing goods, courts in this Circuit have not hesitated to grant *ex parte* orders under either the Lanham Act or the Copyright Act. *Century Home Entertainment, Inc. v. Laser Beat, Inc.,* 859 F.Supp. 636, 638 (E.D.N.Y. 1994) (citing cases). Moreover, even if equipment may be used for a legitimate purpose, it is not protected from seizure if it has been employed for the illegal purposes alleged. *Id.* at 639. Though in ordinary cases orders that disrupt the status quo are frowned upon, in infringement cases the policy allowing *ex parte* seizure and impoundment is clear: "If notice is required, that notice all too often appears to serve only to render fruitless further prosecution of the action. This is precisely contrary to the normal and intended role of 'notice,' and it is surely not what the authors of the rule either

anticipated or intended." *Matter of Vuitton et Fils, S.A.,* 606 F.2d 1, 4–5 (2d Cir.1979); *Vuitton v. White,* 945 F.2d 569 (3d Cir.1991). Even in infringement cases, however, a seizure order should not be granted lightly. *Warner Bros Inc. v. Dae Rim Trading, Inc.,* 877 F.2d 1120, 1125 (2d Cir.1989).

Congress gave voice to similar principles when enacting the 1984 amendments to the Lanham Act, which explicitly provided the authority for *ex parte* seizure in cases of counterfeited marks. Congress explained the propensity of

> those who deal in counterfeits ... to destroy or transfer counterfeit merchandise when a day in court is on the horizon. The ex parte seizure procedure is intended to thwart this bad faith tactic, while ensuring ample procedural protections for persons against whom such orders are issued.

130 Cong. Rec. H12076 at 12080 (Oct. 10, 1984), *quoted in* 4 McCarthy on Trademarks § 30.16[2][b].

Such orders should not be granted injudiciously. In amending the Lanham Act to authorize *ex parte* seizure, Congress enacted explicit safeguards to protect the rights of prospective defendants. A court "shall not grant such an application unless—

> A. the person obtaining an order under this subsection provides the security determined adequate by the court for the payment of such damages as any person may be entitled to recover as a result of a wrongful seizure or wrongful attempted seizure under this subsection; and
>
> B. the court finds that it clearly appears from specific facts that—
>
> i. an order other than an ex parte seizure order is not adequate to achieve the purposes of ... this Act;
>
> ii. the applicant has not publicized the requested seizure;
>
> iii. the applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or. services;
>
> iv. an immediate and irreparable injury will occur if such seizure is not ordered;
>
> v. the matter to be seized will be located at the place identified in the application;
>
> vi. the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and
>
> vii. the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person."

15 U.S.C. § 1116(d)(4)(B).

These requirements clearly reflect Congress' concern with defendants' Fourth and Fifth Amendment rights. Discussing the security requirement, Congress noted that

> [t]he provision of a bond is one of the critical procedural protections designed to ensure that the defendant's rights are adequately protected during the course of an ex parte seizure. In setting the amount of security, courts should err on the side of caution—that is, toward larger bonds—in light of the need to protect the unrepresented defendant, and to ensure that the defendant will have an effective remedy if he or she is the victim of a wrongful seizure.

With respect to requirement that the application identify the place where the matter to be seized may be found, Congress acknowledged that courts will have to be flexible—

> but should require as great a degree of specificity as is possible under the circumstances, and should not grant orders, for example, permitting seizure to take place "anywhere in downtown Washington, DC."

130 Cong. Rec. H12076, *quoted in* McCarthy, Appendix A8 at A8–18 to A8–20.

■ As this Court has previously noted, similar concerns are involved in seizures under the Copyright Act. *See Paramount Pictures v. Doe,* 821 F.Supp. 82 (E.D.N.Y. 1993);[3] *see also Warner Bros.,* 877 F.2d at

---

**3.** In *Paramount Pictures,* this court employed a five part test to determine whether a proposed seizure order for copyright infringement com-

1126 (2d Cir.1989) (noting Fourth and Fifth Amendment concerns in *ex parte* seizures).

■ It is by now well settled that seizures pursuant to civil actions are subject to Fourth Amendment scrutiny.[1] *See Soldal v. Cook County, Ill.*, —— U.S. ——, ——, 113 S.Ct. 538, 543, 121 L.Ed.2d 450 (1992); *see also Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978) (Fourth Amendment "protects against warrantless intrusions during civil as well as criminal investigations"). As the Supreme Court has held, "[a] 'seizure' of property ... occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). The Fourth Amendment protects against governmental intrusions in the form of both searches and seizures. *Id.* Furthermore, seizures may be considered unreasonable even if not accompanied by a meaningful "search" or if no privacy or liberty interest is impaired. *Id.* —— U.S. at ——–——, 113 S.Ct. at 545–47.

■ The 1984 Amendments to the Lanham Act are constitutional under the Fourth Amendment. *Reebok Int'l Ltd. v. Su Youn Pak*, 683 F.Supp. 929, 930 (S.D.N.Y.1987). However, this statute must be construed in accordance with the Constitution—the statute itself may pass constitutional muster, but

clearly it may not be applied in an unconstitutional manner. Though the Fourth Amendment principles of probable cause and particularity do not apply with the same force in civil proceedings, they inform and restrict the statute's implementation. *Paramount*, 821 F.Supp. at 90.

■ Plaintiffs' proposed order would violate the Fourth Amendment in several respects. First, in direct contravention of the Second Circuit's recommendation, plaintiffs would have a private investigator conduct the seizure and impoundment.[5] *Warner Bros. Inc.*, 877 F.2d at 1124–26. In *Warner Bros.*, the Second Circuit expressed its disapproval of search and seizure by a private agent in a copyright case, holding that "tradition and established law dictate that such drastic acts as seizure and impoundment be conducted by neutral and impartial persons" and that "many Fourth and Fifth Amendment problems may be avoided" when a sheriff or other officer of the law is used to effect the seizure. Moreover, the 1984 amendments to the Lanham Act explicitly provide that seizures must be effected by "a United States Marshal or other law enforcement officer." 15 U.S.C. § 1116(d)(9); *Warner Bros.*, 877 at 1125.

Second, the plaintiffs have failed to provide sufficient particularity for the premises to be searched or the articles to be seized. As the Supreme Court has explained,

---

plied with the requirements of due process. A plaintiff must show

> (1) the availability of ex parte prejudgment seizure must be limited to situations where plaintiff has established that the property to be seized is of a type that can be readily concealed, disposed of, or destroyed; (2) the plaintiff must allege specific facts based on actual knowledge supporting the underlying action and the right off plaintiff to seize the property; (3) the application for the order of seizure must be made to a judge rather than to a clerk; (4) the defendant has a right to a prompt, postseizure hearing to challenge the seizure; and (5) the defendant must be able to recover damages from the plaintiff if the taking was wrongful and to regain possession of the seized items by filing a bond.

821 F.Supp. at 88–89 (citing *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 616–18, 94 S.Ct. 1895, 1904–05, 40 L.Ed.2d 406 (1974)). Plaintiffs have complied with the standards of due process set forth in *Paramount*. At least some of the proper-

ty involved—T-Shirts and the like—is readily concealed or destroyed; plaintiffs have produced the affidavit of a private investigator who has personal, actual knowledge of the infringements; and plaintiffs have come before a court with an order directing a prompt postseizure hearing and offering to file a bond as security.

4. The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

5. They order states that either U.S. Marshals "or" a private investigator from a specified firm shall conduct the search—presumably, the choice would be plaintiffs'.

[t]he manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit. Thus, the scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe that it may be found.'

*Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987) (quoting *United States v. Ross*, 456 U.S. 798, 824, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982)); *see also Andersen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976).

Plaintiffs' declarations express personal knowledge of only two locations where infringing goods are known to be produced or stored. Nevertheless, they seek an order which would allow their agents

> to search for, inventory, seize, and impound all of the following [items] in Defendants' possession, custody, or control, including any vehicles in the possession, custody or control of Defendants **at any location in New York** where counterfeit or infringing merchandise bearing Plaintiff's copyrighted Designs and Trademarks is manufactured, distributed, sold, offered for sale and stored. . . .

Pls.' Proposed Order at 11 (emphasis added). Not only does this order not come close to the particularity required by the Fourth Amendment, it is exactly the kind of order Congress intended to prohibit with 15 U.S.C. § 1116(d)(4)(B)(v). To allow the U.S. Marshals—or worse, plaintiffs' agents alone—to engage in such a roving search would violate both the Constitution and the law.

As noted above, one of the sites plaintiffs allege infringing merchandise is located is a private residence; yet the investigators' affidavits do not adequately establish that infringing merchandise is located there. Moreover, the search of a private residence raises other constitutional issues that neither plaintiffs' papers nor their proposed order adequately address. The order would grant the marshals

> the right to enter the premises of Defendants and/or the locations to be searched, regardless of whether said premises and/or locations are locked or unlocked or occupied or unoccupied using such force as is necessary to accomplish this, and to inspect the contents of any rooms, closets, cabinets, vehicles, containers or desks.

Pl. Proposed Order at 11. "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (citations omitted), and plaintiffs have provided no cause for such a broad search. Their investigator has examined certain facilities—there is neither evidence nor even reasonable inference that infringing goods might be found elsewhere in the home of the named defendants.[6]

Plaintiffs' proposed order is equally sweeping with respect to the materials to be seized. In order to prevent unconstitutionally intrusive searches, "[a] warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir.1992). Plaintiffs' papers, however, are not sufficiently descriptive of infringing materials. Plaintiff Saban has only provided murky photocopies of its marks from which a marshal would be hard-pressed to determine if a particular depiction is an infringement.[7]

---

**6.** As the Supreme Court has observed, "Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase." *See Maryland v. Garrison*, 480 U.S. at 84, 107 S.Ct. at 1016–17

(quoting *Ross*, 456 U.S. at 824, 102 S.Ct. at 2172). Similarly, here, where screenprinting machines and dryers have been observed in a basement and a commercial building, there is no cause to believe that infringing materials might be found in a bedroom closet or desk.

**7.** The proposed order provides that plaintiffs' attorneys shall accompany the Marshals to deter-

Moreover, plaintiff's order contains no internal references to the "LOONEY TUNES" or "POWER RANGERS" marks but instead broadly covers all of plaintiffs' trademarks, in the discretion of the attorney participating in the search. *See id.* (warrant invalid where it granted executing officers "virtually unfettered discretion to seize anything they [saw].").

Plaintiffs' papers also fail to show that an order of a more limited scope or remedy would not be adequate in these circumstances. 15 U.S.C. § 1116(d)(4)(B)(i). This requirement was addressed by the Third Circuit Court of Appeals in *Vuitton v. White*, 945 F.2d 569 (3d Cir.1991). The court there recognized that under section 1116(d) a court must find both that notice will thwart effective relief and that a temporary restraining order would be ineffective. *Id.* at 575. Several of the defendants in *Vuitton* were already subject to a permanent injunction and yet were still producing counterfeit merchandise—in these circumstances, the Court of Appeals held that it would be an abuse of discretion to deny a seizure order "without explaining how an ex parte restraining order can be expected to effectively alter the defendants' behavior." *Id.*

Here, plaintiffs have not shown that the facts warrant the broad search and seizure powers they request. They have not directed the Court to any prior injunction against these defendants, nor have they shown that notice plus an injunction would thwart all relief; these defendants are not street vendors but manufacturers, with printing equipment and machinery that presumably cannot be easily moved or destroyed. It is not at all clear why an injunction prohibiting sale, transfer, or destruction of evidence, plus the expedited discovery sought by plaintiffs, including an order to enter on land to inspect and photograph the premises after the injunction is entered would not suffice. *See* Fed.R.Civ.P. 34, 45(a)(1)(C). Such an order would be backed by the power of the Court to hold defendants in contempt, including criminal conduct, if it were violated. More-

over, plaintiffs do not even explain why a more limited seizure would not suffice. When identified with particularity as to description and location, infringing goods and manufacturing materials that are easily transferred or destroyed might be seized upon a lesser showing than that which would justify the expansive and invasive relief they currently seek.

Aside from the Fourth Amendment issues, two other provisions of this proposed order are troublesome. First, in the section of the order restraining defendants from selling, distributing or destroying infringing goods is a provision that would bar defendants from "communicating, directly or indirectly, with any person or persons from whom they purchased or to whom they sold [infringing] products ... or who they know possess or control or have access to such products ... or any other person or persons (except their attorneys) about this action of Plaintiffs' request for this Order." In similar cases brought by these plaintiffs in this Court, Judges Amon and Ross of this District have stricken this provision from the orders when granting an injunction or seizure.

Second, plaintiffs request an order as follows:

> Defendants are hereby required to give a correct name, residential address, and telephone number where each of them can be reached to the United States Marshal's service, the New York Police, or other law enforcement officers, and that failure to give such correct name, address, and telephone number may result in contempt of Court.

Pls.' Proposed Order at 15. Aside from the Fifth Amendment issues, plaintiffs offer no authority for having the marshal conduct their discovery at this stage of the proceeding.

The activities of the defendants are perhaps illicit, but the law provides for procedures through which those activities may be fairly brought to a halt which respects the interests of both plaintiffs and defendants. As the Court has noted elsewhere, proceed-

---

mine what items (merchandise, machinery and business records) are infringing their rights, but this still places expansive judicial power in plain-

tiffs' hands, as the broadly worded order and the muddled exhibits would foreclose the Marshals from making independent judgments.

ing in this fashion has only delayed the plaintiffs' cause. With a more carefully drafted and supported order, plaintiffs might well have an adequate remedy in hand.

■ Finally, plaintiffs' attorneys have neglected the well-established rule of professional responsibility that a lawyer shall not "fail to disclose ... legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client." Model Rule 3.3; Code of Professional Responsibility DR 7–106(B)(1). Plaintiffs'. attorneys have breached this responsibility in two instances: failing to point out that *Warner Bros.* and the Lanham Act allow only marshals to conduct searches and failing to point out that other courts in this district have declined to grant the injunction on communication by defendants. *See generally* 1 Hazard & Hodes, The Law of Lawyering § 3.3:207 (2d ed. 1990).[8] In an *ex parte* proceeding, in which the adversary system lacks its usual safeguards, the duties on the moving party must be correspondingly greater. *See* Model Rule 3.3(d) (requiring disclosure of adverse material facts in *ex parte* proceedings).

Accordingly, plaintiffs' application for an *ex parte* application for a temporary injunction and restraining order is hereby denied, without prejudice. The application to have the case sealed is granted, with the exception of this opinion.

The Clerk is directed to mail a copy of the within to the plaintiffs.

SO ORDERED.

CABLEVISION SYSTEMS
CORPORATION, et
al., Plaintiffs,

v.

Can MUNEYYIRCI, a/k/a Jon Neyir, and
Jon Meyer, et al., Defendants.

No. CV 90–2997 (RJD).

United States District Court,
E.D. New York.

Dec. 29, 1994.

---

8. While plaintiffs cite this court's earlier decision in *Paramount Pictures, supra,* they do so in a context with little bearing on the issues raised by their papers. This has not misled the author of this opinion, but it might mislead another judge dealing with plaintiffs' emergency application, particularly since plaintiffs offer by affidavit string cites of other cases in which other judges have signed plaintiffs' order without altering a line.

Daniel J. Lefkowitz, Jericho, NY, for plaintiffs.

Bennete D. Kramer, Schlam Stone & Dolan, New York City, for defendants.

### MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiffs Cablevision Systems Corporation, et al., (hereinafter "Cablevision") brought this action alleging that defendants engaged in illegal sales of cable television equipment in violation of sections 553 and 605 of Title 47 of the United States Code. Chief Magistrate Judge Chrein conducted a three-day evidentiary hearing on Cablevision's application for a preliminary injunction and related relief. The Court subsequently adopted the recommendation of the Magistrate Judge and preliminarily enjoined the defendants from further sales and related activities by order dated February 6, 1991.

Thereafter, on April 26, 1991, Cablevision moved for summary judgment with respect to 2,609 sales.

This memorandum addresses two issues. First, the Court must determine to what extent Cablevision has established as a matter of law that defendants made illegal sales of cable equipment entitling Cablevision to summary judgment. Secondly, the Court must decide whether section 605, with its harsher statutory penalties, prohibits such sales.

Defendants concede 17 illegal sales that were the subject of testimony before the Magistrate Judge. The Court now concludes that defendants have failed to identify a genuine issue of material fact with respect to the legality of 373 additional sales and that plaintiff is therefore entitled to partial summary judgment with respect to 390 sales. The Court concludes after weighing all the relevant circumstances that the sum of $10,000 per sale is an appropriate measure of damages in this case.

## I. Background

Cablevision is licensed by various programming originators and distributors to receive television programming for distribution to its subscribers through a cable system. The programming originators transmit the programming via satellite to an earth station. The signals are then sent to Cablevision's "head-end", where they are converted into a form that can be transmitted through the cable system itself. Finally, the signals are relayed through the cable system to subscribers' homes.

Cablevision charges a monthly fee for its basic cable service and additional fees for access to premium channels such as HBO and the Disney Channel. Subscribers can also order "Pay–Per–View" services for individual events. All of the programming signals available on Cablevision's system are delivered to each household, regardless of the extent of the individual subscriber's service. Once the signals reach the subscriber's home, a converter modifies them into a form that can be viewed on a television set. To prevent subscribers from receiving cable programming for which they have not paid, Ca-

blevision scrambles the signals for certain types of programming—generally, premium and "Pay–Per–View" channels. Cablevision provides subscribers with a decoder which is adjusted to descramble only the signals for which a subscriber has paid. The decoder is either attached to the converter or incorporated into the converter as a combination unit.

Unscrupulous cable customers are able to gain access to programming they have not paid for by purchasing pirate decoders, combination units, or converters that have been illicitly modified to descramble signals. The sale of such equipment is illegal if the seller knows the equipment is to be used to access scrambled programming without payment.

On August 24, 1990, plaintiffs began this action and by Order to Show Cause sought a preliminary injunction against defendants' continued sale of devices used to descramble Cablevision's cable signals without payment, claiming that defendants' conduct violated sections 553 and 605 of Title 47 of the United States Code. Plaintiffs seek permanent injunctive and monetary relief.

On September 27, 1990, Chief Magistrate Judge Chrein issued a Report and Recommendation, finding that there was "ample evidence to establish that both defendants [Jon Neyir and Rita DeGirmenci] knowingly and willfully sold devices to persons who sought to use those devices and who announced their intention to use these devices to circumvent the blocking that was done by the cable companies to prevent the receipt of unpaid for services." (Tr., 9/27/90 at 214). The Magistrate Judge recommended that this Court authorize the seizure of any decoder or other device that had been adapted to descramble signals, enjoin the sale of the same, and enjoin the modification of any converter that would render it capable of descrambling. On October 4, 1990, the Court authorized the seizure of defendants' stockpiles of decoding equipment, pending further consideration of Chief Magistrate Judge Chrein's Report and Recommendation. The Court adopted the Magistrate Judge's Report and Recommendation and granted

the preliminary injunction by order dated February 6, 1991.

Plaintiffs moved for summary judgment on April 26, 1991. On June 21, 1991, the Court heard arguments on the summary judgment motion and indicated that it would grant summary judgment with respect to an undetermined number of sales. The Court invited further submissions regarding liability and reserved decision on the issue of damages.

The Court now addresses the issues of summary judgment and damages and the related question of statutory interpretation.

## II. Summary Judgment

■ Defendants concede their liability for 17 illegal sales of decoders (Tr., 6/21/91 at 2; Defendants' Memorandum in Opposition to Summary Judgment at 2). Cablevision, however, seeks summary judgment and statutory damages with respect to an additional 2,609 mail order sales of cable equipment by defendants during the two year period August 1988 to August 1990.[1] Cablevision has tendered persuasive evidence that there is no legitimate retail market for decoders or combination units since these units are provided by cable companies as part of the cable service. Accordingly, Cablevision claims that all retail sales of such devices must be illegal. Cablevision insists that the inference of illegality is inescapable given the defendants' very incriminating admissions to undercover agents and operatives concerning illegal sales, evidenced during the preliminary injunction hearing, as well as the defendants' utter failure to proffer any evidence of legitimate sales at any time in opposition to the summary judgment motion.

Critical to the analysis is the uncontroverted evidence presented to the Magistrate Judge regarding a relatively small number of blatantly illegal decoder sales. Enhanced by Rita DeGirmenci's and Jon Neyir's damaging admissions to agents of the Federal Bureau of Investigation and others,[2] the evidence of

1. 2,609 is the number contained in the affidavit of Henry Hack submitted by Cablevision on April 17, 1991. The number is based on the invoices recovered during a search of Video–Link.

   In the extensive submissions that have followed Cablevision's motion for summary judgment, the number of sales has varied, but the Court has chosen to use the original number for the purposes of this analysis. The Court understands that the 2,609 figure includes not only the decoders and combination units, but also equipment related to their use, such as coaxial wire, remotes, filters, antennas and the like.

2. The transcript of the preliminary injunction hearing reveals numerous incriminating admissions by Rita DeGirmenci, Jon Neyir and David Sarjue, the sales manager of Stargaze.

   For example, when Harry Maxwell, Security Director of Cablevision of New York City, acting undercover, was ordering a decoder from DeGirmenci over the phone, he asked her about the disclaimer in the Video–Link advertisement that stated that a purchaser was supposed to notify his cable company when he received descrambling equipment from Video–Link. According to Maxwell, DeGirmenci laughed and responded, "well, you're supposed to notify your cable company." Maxwell said "I understand what you are trying to say" and DeGirmenci responded, "okay, you have it." (Tr., 9/17/90 at 223).

   Cablevision's investigator, Thomas Allen, testified at the preliminary injunction hearing that he spoke to DeGirmenci over the phone and said he wanted a way to lower his cable bills. DeGirmenci told him that she could sell him devices which would enable him to receive all of the channels offered by his cable company. When Allen expressed concern over the $185 she was asking for the equipment, she asked how much it would·cost him to get all of the channels through the cable company. When he said $60 a month, she said, "there you have it; in three months you will be even already." (Tr., 9/17/90 at 198–199).

   During an FBI search of Video–Link on August 22, 1990, Special Agent Garfinkel asked DeGirmenci if the business was legal and she replied, "I don't think so." Sept. 22, p. 326.

   On April 23, 1990, Agent Vogel made undercover purchases directly from Jon Neyir. When he asked whether possession of the decoders was illegal, Neyir said yes, but added that Vogel would "never get caught" because "the cable company is afraid to do anything about it." (Tr., 9/27/90 at 79–80).

   Agent Vogel purchased a decoder at Stargaze from David Sarjue on April 10, 1990. Sarjue explained to Vogel that the box would enable him to receive premium channels while paying only for basic cable. (Tr., 9/27/90 at 19). Furthermore, when Vogel asked Sarjue if it was illegal to use the decoders, Sarjue laughed and said, "yes, but you will never get caught." (Tr., 9/27/90 at 58).

   Finally, during an FBI search of Stargaze on August 22, 1990, Agent Forbes asked Sarjue what Stargaze did and Sarjue replied that they sold converter boxes which "enabled someone getting basic cable service to attach it to the

undercover purchases paints a vivid picture of an extensively, if not exclusively, illegal operation.

Most telling is the defendants' failure to challenge plaintiff by introducing *any* evidence suggesting certain sales were legal—not one invoice, not one purchaser, not one affidavit, not one record of any kind establishing legitimate sales to an authorized distributor, or anyone. And when plaintiffs turned to the defendants Neyir and DeGirmenci for their explanations, these defendants invoked their fifth amendment privilege against self-incrimination.

Essentially, the issues are as follows: whether uncontested evidence of fraudulent intent with respect to at least 17 sales by defendants Stargaze and Video–Link over a limited period of time is sufficient to support an inference that extensive sales of decoders or combination units were made with similar intent, and if so, whether such an inference is so compelling that the Court can conclude that no genuine issue of material fact exists and plaintiff is entitled to judgment as a matter of law.

█ In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court emphasized that, once the moving party has properly supported its motion for summary judgment, Rule 56(e) requires the nonmoving party to proffer evidence to establish that a reasonable jury could rule in his favor: "The movant has the burden of showing that there is no genuine issue of fact, but the [nonmovant] is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). *See also, Addickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 287, 88 S.Ct. 1575, 1592, 20

L.Ed.2d 569 (1968). The nonmovant may not rest solely on the allegations or denials in his pleading; he must present specific facts showing that there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e). *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514.

The defendants have simply not produced any evidence of legitimate sales of decoders or combination units. Their failure to present any evidence of legitimacy, in the face of Cablevision's convincing presentation, including evidence that there is no legitimate retail market for the decoders and combination units, leads the Court to conclude that there is no genuine issue of fact with respect to the legitimacy of sales of single decoders or combination units to individuals.

Admittedly, the Court's decision to limit summary judgment to sales of single devices may appear somewhat arbitrary, particularly in the face of such evidence and the defendants' telling demurrer. Nevertheless, the Court is aware of the drastic nature of summary judgment and must at the same time acknowledge the possibility, however improbable, that certain sales of more than single devices may have been accomplished under circumstances that leave the intent of the sellers somewhat in doubt.

With counsel's assistance, the Court has identified 373 sales of single decoders or combination units to purchasers residing within Cablevision's authorized franchise areas, in addition to the 17 sales that defendants concede were illegal. With respect to these 390 sales, the Court concludes that defendants have failed to demonstrate any genuine issue of material fact regarding their legitimacy and that Cablevision is entitled to judgment thereon.[3]

### III. *Applicability of Section 605*

The only remaining question is the measure and amount of statutory damages to

---

cable outlets in order to get premium channels without paying for it." (Tr., 9/27/90, at 120–21).