**In re YODER'S SLAUGHTERHOUSE SITE, GRANTSVILLE, GARRETT COUNTY MARYLAND.**

**Misc. No. 07–250.**

United States District Court, D. Maryland.

Oct. 16, 2007.

Larry D. Adams, Office of the United States Attorney, Baltimore, MD, for United States of America.

## MEMORANDUM AND ORDER [1]

JAMES K. BREDAR, United States Magistrate Judge.

Before the Court is an application for an administrative warrant brought by the Environmental Protection Agency (EPA) pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. 9601, *et seq.* The warrant sought by the agency would empower it to take certain actions in regard to environmental hazards that the agency believes to exist on the site of an abandoned slaughterhouse in Western Maryland.

The warrant application was presented and is reviewed on an *ex parte* basis. Appended to the application was a declaration/ affidavit from Gregory D. Ham, an on-site coordinator in EPA's Hazardous Cleanup Division. Mr. Ham asserted that on June 14, 2007, he was assigned responsibility for the Yoder's Slaughterhouse Site, 3.77 acres on Locker Lane in Grantsville, Garrett County, Maryland. On that same date, Mr. Ham stated, he had been advised by the Maryland Department of the Environment (MDE) of potentially dangerous conditions on the site, a location that included various outbuildings and which had been abandoned for about two years. He learned, a week later, that the current ownership of the property was clouded, the firm that had been operating having gone through Chapter 7 bankruptcy. He also learned that both M & T Bank, which holds a deed of trust on the property, and Ron Gulledge, former general manager of the bankrupt firm, consented to entry by EPA onto the property. On June 25, 2007, Mr. Ham avers, he, along with representatives of state and local environmental agencies, entered the site and inspected various containers thereon, coming to the conclusion that hazardous materials were present. He stated that between July 6, 2007, and July 18,

---

1. Although this is an *ex parte* matter, the government has not asked that these proceedings be sealed, explicitly disavowed any need for sealed proceedings at the opening of the hearing in Court on the matter, and they are not sealed.

2007, he attempted to obtain consent from Mr. Gulledge to remove the hazardous materials from the site, but Mr. Gulledge denied ownership of the property. On July 19, 2007, Mr. Ham entered the property again and secured the hazardous substances onsite by placing them in rooms secured with combination locks. On September 10, 2007, Mr. Gulledge faxed to Mr. Ham a consent-to-access letter regarding the property, but the letter bore the notation from Mr. Gulledge that, to his knowledge, he did not own the property. Finally, Mr. Ham asserted that there may have been a release of hazardous substances at the property and, at least, there was a threatened release due, among other things, to the threat of vandalism as the site is unattended.

Approximately ten days after Mr. Ham received the consent-to-access letter from Mr. Gulledge, the EPA first approached the Court for an administrative warrant. The request was made on an *ex parte* basis. The Court, after reviewing the CERCLA statute, advised the government of concern as to its authority to issue a warrant, as well as the proposed scope of such a warrant that contemplated not only inspection and identification of the suspected hazardous materials but also removal and destruction of the containers and their contents. The Court responded in a letter to the government noting pertinent sections of CERCLA and concluding that the enforcement scheme prescribed by Congress seemed to contemplate adversarial rather than *ex parte* proceedings, *i.e.*, the commencement of an adversarial civil action—a lawsuit—as opposed to issuance of an *ex parte* warrant. The Court also noted that it was unclear that anyone with ownership or control of the property was

objecting to the course of action proposed by the EPA and that those identified as possible holders of title may have consented, which would seem to make it unnecessary for the Court to act at all, much less issue an *ex parte* warrant.

During the following week, the government indicated that it wished to go forward in its request for an administrative warrant, albeit one scaled back in scope. The Court then directed the government to appear in Court on the record on October 3, 2007, at which time, after lengthy argument, the Court directed the government to provide to the Court two versions of draft administrative warrants—one draft providing authority to remove and dispose of the hazardous materials and the other draft limited to sampling, identification and securing the materials—along with citations to case law discussing the authority of the Court to issue administrative warrants pursuant to CERCLA and the permissible scope of such warrants. The government since has provided to the Court two draft warrants for its consideration along with a "supplemental memorandum," [2] as well as a supplement to the supplement containing papers from a similar proceeding in the United States District Court for the District of Massachusetts.

A candid colloquy between the government and the Court, on the record during the above-mentioned hearing, disclosed the crux of the problem, from a practical standpoint. The government finds itself in an uncomfortable position because it has not satisfied itself that the "consents-to-entry" that it has received from M & T Bank and Mr. Gulledge are effective, *i.e.* that either of these parties are empowered to consent. Put even more simply, the

---

**2.** The Court notes that the two warrants are facially different but, the statement of the government and the titles of the warrants

notwithstanding, both of the draft warrants appear to authorize the removal and disposal of containers and their contents.

government doesn't know to a certainty who owns the property. Absent that knowledge, the government is seeking legal cover from the Court in the form of a warrant in the event that a currently unidentified owner shows up after the fact and complains of the action taken by the government.

The Court, of course, must satisfy itself that it is acting within its authority, despite the government's discomfort and inconvenience. In short, it is not in the Court's charter to simply and pro-actively insinuate itself into the cure of such public problems as it can identify. Because the Court's power, when lawfully exercised, is great, great care must be taken to see that its exercise is lawful. The Court has been demanding in this case because its authority is not at all clear. The Court has two specific concerns—(a)whether the Court has authority to issue *ex parte* administrative warrants to the EPA pursuant to CERCLA and (b) if the Court has such authority, whether such warrants must be limited in scope to securing access and obtaining information.

The government, for its part, concedes that CERCLA does not contain a specific grant of jurisdiction to the Court with respect to the issuance of administrative warrants, but it has urged upon the Court the notion that CERCLA contemplates the use of warrants. Specifically, the government argues that this contemplation is implicit in 42 U.S.C. 9406(e)(6): "Nothing in this subsection shall preclude the President from securing access or obtaining information in any other lawful manner." The subsection to which this language refers, 42 U.S.C. 9406(e), is entitled "Information gathering and access." All the numbered paragraphs within the subsection appear to be concerned with entry, inspection and sample taking. There is no provision in the subsection for removal

and/or disposal. Accordingly, to the extent that any warrant authority flows from 42 U.S.C. 9406(e)(6), it would seem, at least initially, that such authority does not include removal and/or disposal.

The government refers the Court to *Reeves Brothers, Inc. v. United States Environmental Protection Agency*, 956 F.Supp. 665 (W.D.Va.1995) wherein Chief Judge Kiser determined that the EPA had violated a property owner's Fourth Amendment rights by seizing soil and water samples and removing them from the property for further testing. Although Judge Kiser speaks generally in his analysis of "warrantless search," he does not specifically find that CERCLA provides authority for the issuance of a warrant. To the contrary, he states the following:

> It certainly appears that the EPA violated the statutory procedures for entry and inspection of private property. The EPA should have sought consent, 42 U.S.C. 9604(e)(5)(A); if consent was not obtained, EPA should have sought an administrative or court order compelling the entry and/or inspection, *id.* 9604(e)(4)(A),(B); the EPA should have given the property owner a receipt for the soil samples it took, *id.* 9604(e)(4)(B). The EPA did none of this.

The pertinent code section to which Judge Kiser refers provides *inter alia:*

**(B) Compliance**

The President may ask the Attorney General to *commence a civil action* to compel compliance with a request or order referred to in subparagraph (A). Where there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant, the court shall take the following actions [emphasis supplied]:

(i) In the case of interference with entry or inspection, the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

It would appear at least arguable then that the scheme set forth above circumscribes the role of the Court in the enforcement of CERCLA, *i.e.* the government is to file a lawsuit and move by adversarial civil action.[3] This is the very view noted by the Ninth Circuit in a case that discussed the amendment of CERCLA by the Superfund Amendments & Reauthorization Act of 1986 (SARA) and, specifically 42 U.S.C. 9604(e):

We do not believe that the two sections are sufficiently similar for us to conclude that the powers to employ an administrative warrant under the old and the new versions of *section 9604(e)* are manifestly alike. Section 104(m) of SARA amended *section 9604(e)* to add a new procedure permitting EPA to issue a compliance order "[i]f consent is not granted regarding any request made under those subsections of *section 9604(e)* that govern the EPA's information gathering and access authority." *42 U.S.C. 9604(e)(5)* (as amended by SARA 104(m)). The amended statute also permits the EPA to "commence a civil action to compel compliance" with such an order and requires courts to enjoin interference with the fulfillment of these orders in certain circumstances. *Id.* The EPA enjoyed neither of these powers under the superseded version of *section 9604(e)*. While we express no opinion on the issue, *it is at least theoretically possible that this new compliance order mechanism was intended to be a substitute for any administrative warrant powers that might have existed under the pre-amendment version of the statute.* We therefore cannot say that it is manifest that SARA has not altered the law on this issue [emphasis supplied].

*Bunker Limited Partnership v. United States,* 820 F.2d 308, 312–313 (9th Cir. 1987).

Most recently, the government has provided to the Court a copy of a Memorandum and Order from Magistrate Judge Cohen of the United States District Court for the District of Massachusetts wherein Judge Cohen determined that the District Court had implied power to issue an *ex parte* administrative warrant pursuant to CERCLA, basing his determination upon the holding in *Boliden Metech, Inc. v. United States,* 695 F.Supp. 77 (D.R.I.1988).

■ In *Boliden,* Judge Lagueux, ruling on the legality of an *ex parte* administrative warrant issued pursuant to the Toxic Substances Control Act (TSCA), 15 U.S.C. 2601 *et seq.*, found that, although the inspection section of that act did not dictate what steps the EPA was to take to gain entry to a facility if access was denied, "it seems logical to believe that Congress intended to authorize the EPA to take reasonable steps, such as obtaining a warrant,

---

**3.** During the hearing referenced above, the government conceded traveling the route of a civil action was clearly contemplated by the statute but speculated that it would take too long to work through the bureaucracy—*not the bureaucracy of the Court but of its own agency.* The Court, for its part, stated confidence that if a civil action were filed and a case was fairly made, and if exigency was demonstrated, the Court would act forthwith to grant the EPA whatever was needed to lawfully effectuate its role, all under the umbrella of the properly filed adversarial civil action contemplated by the statute.

to fulfill its inspection obligation." *Id.,* at 80. The difference in the case at bar, of course, is that access *has not been denied* and, as was discussed above, Congress may well have dictated in CERCLA what steps the EPA is to take to gain entry if access *is* denied. Nonetheless, the Court finds quite powerful analysis set forth in *Boliden* that includes a recitation of authority for the proposition that where Congress has given power to an agency to enter and make inspections, the agency *ipso facto* is empowered to seek a warrant. *Id.,* at 82(citations omitted). Moreover, the Court notes that Judge Lagueux persuasively rejected an argument by the property owner that authority for Court action provided by TSCA was intended by Congress to be an exclusive remedy to the EPA for failure to permit entry, thereby preventing the issuance of administrative warrants. *Id.* at 80–81. The precedent and its underlying reasoning persuade this Court, despite the salient differences in the instant case (i.e.: (1) this is *not* a refusal-of-entry case [4] and at most is a lack-of-clear-consent case, and (2) it *is* a different statute being interpreted). In sum, although the Court finds it to be a close question as to whether it has authority to issue a warrant, in the end it is convinced that the same reasoning articulated by Judge Lagueux and the precedents upon which he relied in support of that reasoning are sufficient to support the issuance of an administrative warrant here. And, the scope of the warrant that the Court finds it has the implicit power to enter is broad—as broad as necessary to enable the EPA to enter and perform the statutory mission set out in 42 U.S.C. § 9604. This, of course, is more than mere entry and sampling. But, consistent with the letter and spirit of that provision,

and CERCLA generally, before issuing such a warrant the Court should first satisfy itself that the owner of the targeted property cannot be identified despite reasonable diligence, or that the owner will not consent to the EPA's proposed activities.

Therefore, while having decided that it has the authority to issue the warrant requested, the Court nevertheless is troubled by what it finds to be an insufficient effort by the government to determine who owns the property in question and, derivatively, whether that owner will consent (or, already has consented) to the EPA's proposed activities, possibly eliminating the need for a warrant. For instance, if the defunct corporation is the last clear owner of the property, under Maryland law does Mr. Gulledge retain authority to consent to the EPA's proposed activities? What about the corporation's former officers and directors? Who and where are they? Do they consent? What effort has been made to locate them? More basically, who currently appears as the owner of this tract in the land and tax records of Garrett County? Have those records been examined? Has there been an effort to locate the persons/entities listed there? Do those persons/entities consent? If, despite investigation, ownership remains clouded or confused, can the government expeditiously proceed in state court to quiet title to the property? If not, why not?

■ The Court will issue the requested warrant immediately upon the EPA demonstrating that it has investigated these additional questions and nevertheless remains unable to identify a person or entity with authority to consent (or, immediately

---

**4.** It is of no small interest that agency counsel, at the hearing, voiced some anxiety over the prospect of suing in Court pursuant to 42

U.S.C. 9604(e)(5)(B) in a case in which the EPA could not say that consent had been denied.

upon the EPA demonstrating that it has located the person or entity with such authority and they will *not* consent). Further, if and when the warrant issues, the Court will require the government to serve notice of the warrant's issuance and impending execution upon all persons and entities reasonably identified as potentially having an interest in the property, so as to minimize the impact of this matter moving forward on an *ex parte* rather than an adversarial basis.[5]

Upon the foregoing, IT IS ORDERED that the pending application(s) for issuance of an administrative warrant is DENIED without prejudice to the government again seeking a warrant after making the showing described herein.

---

5. An agency may obtain a warrant upon a showing that reasonable legislative or administrative standards are satisfied with respect to a particular location to be searched. *See, Marshall v. Barlow's*, 436 U.S. 307, 331, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). The Court finds that the affidavit presented in this case satisfies relevant standards set out in CERCLA. In fact, were the Court to conclude that the appropriate standard here is "probable cause," the Court would have no trouble finding that standard to have been met as the affidavit amply demonstrates that there is hazardous waste on this site, that it is not being properly managed or tended to, and that it poses a material risk to public health.