**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
   *Party in Interest-Appellee,*

   and

MARYLAND PORT ADMINISTRATION;
STATE OF MARYLAND CENTRAL
COLLECTION UNIT,
     *Plaintiffs,*

   v.

M/V SANCTUARY, her engines, tackle
equipment, boilers, furniture, and all
other necessaries thereunto
appertaining and belonging, in rem;
POTOMAC NAVIGATION, INCORPORATED;
PROJECT LIFE, INCORPORATED,
    *Defendants-Appellants,*

   and

JOHN CHAMBERLAIN,
     *Claimant.*

No. 07-2123

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(1:07-cv-00602)

Argued: May 13, 2008

Decided: August 25, 2008

Before MICHAEL and DUNCAN, Circuit Judges,
and Jackson L. KISER, Senior United States District Judge
for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Michael wrote the opinion, in which Judge Duncan and Senior Judge Kiser joined.

---

**COUNSEL**

**ARGUED:** Lawrence Jay Kahn, FREEHILL, HOGAN & MAHAR, New York, New York, for Appellants. Ryan Douglas Nelson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Alexander M. Giles, SEMMES, BOWEN & SEMMES, Baltimore, Maryland, for Appellants. Ronald J. Tenpas, Assistant Attorney General, Environment & Natural Resources Division, Michael T. Gray, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

MICHAEL, Circuit Judge:

The main issue in this appeal is whether the Environmental Protection Agency (EPA) may obtain an administrative warrant to carry out its authority under the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 et seq., to inspect places containing regulated chemical substances. We hold that EPA has such authority, and we therefore affirm the district court's issuance of a warrant authorizing the agency to inspect the M/V Sanctuary for polychlorinated biphenyls (PCBs). We also affirm the district court's preliminary injunction order preventing the Sanctuary's owner, Potomac Navigation, Inc., from moving the ship from the pier in Baltimore where it is docked.

I.

A.

The health and environmental risks associated with PCBs are undisputed. EPA has determined that PCBs are "toxic and persistent," may be oncogenic, and "may cause reproductive effects and developmental toxicity in humans." Disposal of Polychlorinated Biphenyls

(PCBs), Part IV, 63 Fed. Reg. 35,385 (June 29, 1998). Since 1979 TSCA has banned the manufacture, processing, distribution in commerce, or use of PCBs, except "in a totally enclosed manner." 15 U.S.C. § 2605(e)(2)(A)-(B). ("'[T]otally enclosed manner' means any manner which will ensure that any exposure of human beings or the environment to a [PCB] will be insignificant as determined by the [EPA] Administrator by rule." *Id.* § 2605(e)(2)(C)). PCBs may not be exported for distribution in commerce without an exemption. 15 U.S.C. §§ 2605(e)(2)(A), 2611(a)(2); 40 C.F.R. § 761.20(c). In addition, TSCA regulations prohibit the export, for purposes of disposal, of PCBs in concentrations of fifty parts per million (ppm) or greater without an exemption. 40 C.F.R. § 761.97(a).

TSCA provides EPA with inspection authority. Specifically, "[f]or purposes of administering [TSCA]," EPA "may inspect any establishment, facility, or other premises in which" substances regulated by the Act "are manufactured, processed, stored, or held before or after their distribution in commerce." 15 U.S.C. § 2610(a). In addition, this inspection authority reaches "any conveyance being used to transport" a regulated substance "in connection with distribution in commerce." *Id.* EPA's inspection powers "extend to all things within the premises or conveyance inspected" that "bear[ ] on whether the requirements of [TSCA]" have been met with respect to regulated substances "within such premises or conveyance." *Id.* § 2610(b).

## B.

The Sanctuary, built in 1944, was once a U.S. Navy hospital ship. The ship was stricken from the Naval Vessel Reports in 1989, and the government sold the ship later that year to Project Life, Inc. (formerly Life International) for $10, with the stipulation that the ship would be used to provide humanitarian services. Project Life docked the Sanctuary at a Maryland Port Authority (MPA) pier in Baltimore, with the announced purpose of converting the ship into a facility for women suffering from addiction. The conversion was never accomplished, and Project Life failed to pay MPA dockage and related charges that became due.

On March 9, 2007, in an effort to recover the unpaid charges, the MPA sued the Sanctuary and Project Life in the District of Maryland.

A warrant for the arrest of the ship was issued and executed. After a default judgment was entered against the Sanctuary and Project Life, Potomac bought the ship for $50,000 at a court-ordered public auction. The October 4, 2007, order confirming the sale gave Potomac sixty days to tow the ship away from Baltimore, and Potomac advised the court that the ship would be moved to Piraeus, Greece, or another location for refurbishment, "most likely as a storage unit, a hotel platform, or other similar use." J.A. 760. On October 30, 2007, shortly before the Sanctuary's planned towage, the Basel Action Network (BAN), an environmental watchdog group, e-mailed Kelly L. Bunker, PCB Coordinator for EPA's Region III, which includes Baltimore. According to its e-mail, BAN believed that the Sanctuary contained PCBs and would likely be towed to another location and dismantled in violation of TSCA's ban on the export of PCBs.

BAN's e-mail prompted Bunker to research the Sanctuary's history to assess whether it was likely to contain PCBs. Bunker learned from EPA technical guidance documents that PCBs are most likely to be present in ships built before the 1979 PCB ban. She learned from a 2001 RAND Corporation report that PCBs were present "in many plastics, rubbers, adhesives, gaskets, and other commercial nonmetal products used in Navy ships" and that testing of retired ships indicated that "up to 98% of all the Navy ships awaiting disposal may contain regulated amounts of PCBs in solid materials." J.A. 487, 517-18. The Sanctuary's potential for containing PCBs was also assessed by Laura A. Casey, a chemist employed in EPA's Office of Solid Waste, Hazardous Waste Identification Division, International and Transportation Branch, who had over nine years' experience dealing with PCBs in connection with the disposal of ships. Casey reviewed data regarding the presence of PCBs on numerous non-combatant ships similar to the Sanctuary, built between the 1940s and 1970s. She compiled a list of items and materials on these ships that have been found to contain PCBs, including electrical cable, rubber and felt gaskets, insulation material, paints, caulking, and numerous rubber applications. Casey concluded that the Sanctuary likely contained materials with PCBs, which are regulated under TSCA.

After Bunker and Casey completed their analyses, EPA learned that PCBs were in fact present on the Sanctuary. This information came from Kevin J. McCabe, managing member of a ship recycling

firm that considered bidding for the Sanctuary. McCabe reported that four out of the five paint samples his company took from the Sanctuary tested positive for PCBs in concentrations well over fifty ppm. EPA also obtained information from Polly Parks, a ship recycling consultant, who was familiar with deceptive practices occurring in connection with the disposal of PCB-laden ships built in the same era as the Sanctuary. According to Parks, the buyer of such a ship often claims that it will be repaired and refurbished; instead the ship is towed to a third world country where it is dismantled and sold at a huge profit on the scrap metal market.

In early November 2007, pursuant to its authority under TSCA, EPA requested permission from Potomac to inspect the Sanctuary for materials containing PCBs. Potomac denied EPA's request. Shortly thereafter, EPA (1) applied to the district court for an administrative warrant authorizing the inspection, and (2) moved for a preliminary injunction to prohibit Potomac from moving the Sanctuary from the Baltimore pier until EPA could complete the inspection and determine whether enforcement action was necessary. EPA's application and motion were supported in part by the information in the preceding two paragraphs, which was submitted in the declarations of Bunker, Casey, McCabe, and Parks. The district court issued the warrant for the inspection of the Sanctuary and granted the preliminary injunction. The court also denied Potomac's request for a *Franks* hearing on the integrity of the declarations supporting the warrant.

Potomac appeals, contending that the district court erred in (1) concluding that EPA has warrant authority under TSCA, (2) finding probable cause to support issuance of the administrative warrant, (3) concluding that the Sanctuary was a proper location for inspection under TSCA, (4) denying Potomac's request for a *Franks* hearing, and (5) granting the preliminary injunction that enjoined the towage of the Sanctuary from Baltimore.

## II.

Potomac argues that EPA lacks warrant authority because TSCA does not specifically confer it. We review this legal issue de novo, *United States v. Deaton*, 332 F.3d 698, 703-04 (4th Cir. 2003), and

hold that EPA's inspection authority under TSCA carries with it the authority to obtain a warrant.

TSCA explicitly authorizes EPA to inspect a premises or conveyance where there are substances regulated by the Act. 15 U.S.C. § 2610(a). The scope of this inspection authority "extend[s] to all things within the premises or conveyance" that "bear[ ] on whether the requirements" of TSCA are met. *Id.* § 2610(b). "When Congress invests an agency with enforcement and investigatory authority, it is not necessary [for Congress] to identify explicitly each and every technique that may be used in executing the statutory mission." *Dow Chemical Co. v. United States*, 476 U.S. 227, 233 (1986). Instead, "[r]egulatory or enforcement authority generally carries with it all the modes of inquiry and investigation traditionally employed or useful to execute the authority granted." *Id.*

Accordingly, courts have consistently held that a federal regulatory agency is authorized to apply for a warrant to execute a statutory grant of inspection authority. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 325 & n.23 (1978) (holding warrantless inspections under the Occupational Safety and Health Act unconstitutional, but concluding that "there would be no occasion for enjoining the inspections authorized" by the statute if the agency obtained a warrant satisfying the Fourth Amendment); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1222 (D.C. Cir. 1981) (inferring "from the provisions of the Immigration and Nationality Act some predicate power to obtain search warrants in aid of the enforcement activities specifically delineated in the statute, although the statute does not explicitly authorize such warrants"); *Bunker Hill Co. Lead & Zinc Smelter v. EPA*, 658 F.2d 1280, 1285 (9th Cir. 1981) (holding that the Clean Air Act's grant of the power of entry for inspection provided "sufficient authority to justify obtaining inspection warrants"); *Midwest Growers Coop. Corp. v. Kirkemo*, 533 F.2d 455, 462 (9th Cir. 1976) (holding that "non-consensual administrative searches may be accomplished through warrants of inspection when the administrative agency is granted by Congress the power of entry to make its inspections"); *In re Yoder's Slaughterhouse Site*, 519 F. Supp. 2d 574, 579 (D. Md. 2007) (holding that provisions of the Comprehensive Environmental Response, Compensation, and Liability Act authorizing entry, inspection, and sampling imply warrant authority "as broad as necessary to

enable the EPA to enter and perform the statutory mission"); *Boliden Metech, Inc. v. United States*, 695 F. Supp. 77, 80-82 (D.R.I. 1988) (holding that warrant authority follows from TSCA's grant of entry and inspection authority).

Potomac argues that in TSCA Congress granted EPA subpoena power "[i]n lieu of warrant authority." Appellants' Br. 16. We disagree. EPA's authority to seek a warrant stems from its inspection authority. The inspection authority and the subpoena power are separate grants of authority governing separate subjects of investigation. EPA's inspection authority extends to the physical inspection of premises or conveyances, 15 U.S.C. § 2610(a), while its subpoena power extends to persons (or entities) who may be compelled to testify or to produce reports, documents, or other information, *id.* § 2610(c). Nothing in Congress's grant of subpoena power indicates that it intended to preclude EPA from obtaining warrants to implement its inspection authority.

In sum, EPA may obtain administrative warrants to carry out its inspection authority under TSCA.

### III.

Potomac argues that even if EPA has warrant authority, the district court erred in finding probable cause for the issuance of the warrant to inspect the Sanctuary. On review we determine whether the district court had a substantial basis for its probable cause determination, *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006), and we "should [pay] great deference" to that determination, *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation and internal quotation marks omitted).

Probable cause for an administrative warrant may be based on (1) "specific evidence of an existing violation," or (2) "a showing that reasonable legislative or administrative standards for conducting an inspection are satisfied with respect to a particular establishment." *Marshall v. Barlow's, Inc.*, 436 U.S. at 320 (citation, internal quotation marks, and alterations omitted). The warrant here was based on the legislative standard for inspection set forth in 15 U.S.C. § 2610. We therefore reiterate the statutory standard and consider whether the

district court had a substantial basis for finding probable cause under that standard.

Again, § 2610(a) authorizes EPA to inspect — "[f]or purposes of administering [TSCA]" — places that include a premises where a regulated chemical substance, including PCBs, is held before or after its distribution in commerce. Section 2610(b) extends EPA's inspection authority to all things in a premises that bear on whether TSCA's requirements have been met with respect to the regulated substance present within the premises. Here, the district court had a substantial basis for finding probable cause to issue a warrant under the legislative standard in § 2610. Specifically, there was a substantial basis to find (1) that PCBs, regulated by TSCA, were held on the Sanctuary, and (2) that EPA required access to the ship to conduct an inspection for purposes of administering TSCA.

First, sampling data showed that PCBs were present in paint coatings on the Sanctuary. Moreover, as EPA's research revealed, it was likely that PCBs were in, or exposed on the surfaces of, other components, equipment, and materials on the ship. It was also likely that the PCBs would be in, or on the surfaces of, items that were not being maintained "in a totally enclosed manner." *See* 15 U.S.C. § 2605(e)(2)(A)-(C).

Second, based on the demonstrated likelihood of PCB presence on the Sanctuary, EPA sought the warrant for purposes of administering TSCA. The specific administrative purposes were set forth in the affidavit of EPA Region III PCB Coordinator, Kelly Bunker, submitted in support of the warrant application. An inspection was necessary for EPA to determine whether the Sanctuary was in compliance with TSCA and regulations governing PCBs. For example, the inspection would allow EPA to determine whether PCBs located on the Sanctuary were being maintained or used "in a totally enclosed manner," as required by TSCA. *See id.* § 2605(e)(2)(A), (C). An inspection was also necessary to determine whether PCBs on the Sanctuary posed an unreasonable risk to human health or the environment. This determination would, in turn, allow EPA to take action to abate any risk. For example, EPA could decide to bring an enforcement action to prevent the PCBs' removal from the country and to require their proper disposal. *See* 15 U.S.C. §§ 2606, 2616.

Potomac argues that there was not probable cause to justify the warrant because its planned refurbishment of the Sanctuary abroad would not constitute the "*export* [of] PCBs for distribution in commerce in violation of 15 U.S.C. §2611." Appellants' Br. 19 (emphasis added). Thus, according to Potomac, EPA did not seek the warrant for purposes of administering TSCA. The issue with respect to exportation was immaterial to the determination of probable cause in this case. The district court issued the warrant because there was probable cause to believe that PCBs were present on the Sanctuary, rendering it proper for EPA to conduct an inspection to determine whether TSCA's requirements were being met. EPA thus obtained the warrant pursuant to its statutory authority to administer TSCA.

IV.

Potomac contends that the warrant was invalid because the Sanctuary does not qualify as a place where an inspection is authorized by TSCA. Specifically, according to Potomac, the Sanctuary is neither a premises where PCBs are held "before or after their distribution in commerce" nor a conveyance being used to transport PCBs "in connection with distribution in commerce." *See* 15 U.S.C. § 2610(a). Potomac argues that the Sanctuary does not qualify for inspection as a premises because PCBs are not being held there before or after their distribution in commerce. However, Potomac cannot credibly argue that any PCBs in the coatings (paint, for example), components, or materials in the Sanctuary were not distributed in commerce before the ship was built. We therefore agree with EPA that the Sanctuary is a premises that may be inspected under § 2610(a). Because the Sanctuary qualifies for inspection as a premises, we will not consider Potomac's argument that the ship does not qualify for inspection as a conveyance.

V.

Potomac argues that the district court erred in denying it a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154 (1978). To obtain a *Franks* hearing on the integrity of an affidavit supporting a search warrant, the movant must make "*a substantial preliminary showing* that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affi-

davit." *Franks*, 438 U.S. at 155-56 (emphasis added). The false statement must, of course, be "necessary to the finding of probable cause." *Id.* at 156. EPA represents that Potomac, in its reply brief in district court, acknowledged that it "'is unable at this time to point to any specific instances of untrue statements in the application'" for a warrant. Appellee's Br. 24. Potomac does not contest this representation. Indeed, Potomac has not pointed to anything in the record that establishes that it made the substantial preliminary showing, required by *Franks*, to the district court. We therefore conclude that the district court did not err in denying a *Franks* hearing.

VI.

Potomac finally argues that the district court erred in granting a preliminary injunction prohibiting the Sanctuary's movement from the pier in Baltimore. We review the decision to grant a preliminary injunction for abuse of discretion, with factual determinations considered for clear error and legal conclusions considered de novo. *Safety-Kleen, Inc. v. Wyche*, 274 F.3d 846, 859 (4th Cir. 2001). The district court applied the familiar *Blackwelder* test in deciding to grant the preliminary injunction. *See Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193-96 (4th Cir. 1977).

Potomac argues that the district court erred in finding that "the potential threat to the public health by the exposure of PCB's [sic] if this injunction should be denied far outweighs the potential harm to Potomac which is essentially an economic loss." J.A. 866; *see Safety-Kleen*, 274 F.2d at 859 (noting that as part of the *Blackwelder* analysis a court "balance[s] the likelihood of harm to the plaintiff [if a preliminary injunction is not granted] against the likelihood of harm to the defendant [if the injunction is granted]"). Potomac does not challenge the court's determination that EPA's interest as plaintiff "is indistinguishable from the public interest." J.A. 865.

The record amply supports the district court's finding that the balance of harms weighs heavily in favor of EPA and the public health interests it represents. EPA presented unchallenged information showing that PCBs are stable (and therefore persistent), mobile, and toxic, and may have adverse reproductive and developmental effects in humans. The agency has determined that "any exposure of human

beings or the environment to PCBs . . . may be significant, depending on such factors as the quantity of PCBs involved in the exposure." 40 C.F.R. § 761.20. EPA introduced (1) evidence of sampling data showing the presence of PCBs in concentrations greater than fifty ppm in paint applications on the Sanctuary, and (2) evidence of the likelihood that PCBs were disbursed on various items and components throughout the Sanctuary. In addition to this information, the district court considered Potomac's potential "economic loss with respect to its venture in regard to the Sanctuary." J.A. 866.

Given the serious health and environmental consequences associated with PCBs, the district court did not clearly err in finding that the balance of harms tipped sharply in favor of EPA (and the public interest). In short, the district court did not abuse its discretion in granting a preliminary injunction (of limited duration) that prevented the Sanctuary from being moved from the United States while EPA executed its inspection warrant and considered what, if any, regulatory or enforcement action was warranted.

* * *

For the foregoing reasons, the district court's issuance of the administrative warrant authorizing an inspection of the Sanctuary and its order preliminarily enjoining removal of the ship from the Baltimore pier are

*AFFIRMED.*